**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HECTOR JUAN AYALA,
      *Petitioner-Appellant,*

v.

ROBERT K. WONG, Warden,
      *Respondent-Appellee.*

No. 09-99005

D.C. No.
3:01-CV-01322-
IEG-PLC

OPINION

Appeal from the United States District Court
for the Southern District of California
Irma E. Gonzalez, Chief District Judge, Presiding

Argued and Submitted
February 9, 2012—Pasadena, California

Filed August 29, 2012

Before: Stephen Reinhardt, Kim McLane Wardlaw, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Reinhardt;
Dissent by Judge Callahan

## COUNSEL

Robin L. Phillips and Anthony J. Dain of Procopio, Cory, Hargreaves & Savitch LLP, San Diego, California, for petitioner-appellant Hector Juan Ayala.

Robin H. Derman, Deputy Attorney General of California, San Diego, California, for defendant-appellee Robert K. Wong, Warden.

**OPINION**

REINHARDT, Circuit Judge:

State prisoner Hector Juan Ayala ("Ayala") appeals the denial of his petition for a writ of habeas corpus. During the selection of the jury that convicted Ayala and sentenced him to death, the prosecution used its peremptory challenges to strike all of the black and Hispanic jurors available for challenge. The trial judge concluded that Ayala had established a prima facie case of racial discrimination under *Batson v. Kentucky*, 476 U.S. 79 (1986), but permitted the prosecution to give its justifications for the challenges of these jurors in an in camera hearing from which Ayala and his counsel were excluded. The trial judge then accepted the prosecution's justifications for its strikes without disclosing them to the defense or permitting it to respond. We hold that this procedure violated the Constitution and, together with the state's later loss of a large portion of the record, adversely affected Ayala's substantial rights. We therefore reverse the district court's denial of Ayala's petition and remand with instructions to grant the writ.

**I.**

On April 26, 1985, Jose Luis Rositas, Marcos Antonio Zamora and Ernesto Dominguez Mendez were shot and killed in the garage of an automobile repair shop in San Diego, California. A fourth victim, Pedro Castillo, was shot in the back but managed to escape alive. Castillo identified Ayala, his brother Ronaldo Ayala, and Jose Moreno as the shooters. He claimed that these men had intended to rob the deceased, who ran a heroin distribution business out of the repair shop.

Ayala was subsequently charged with three counts of murder, one count of attempted murder, one count of robbery and three counts of attempted robbery. The information further alleged that the special circumstances of multiple murder and

murder in the attempted commission of robberies were applicable in his case. A finding that one of these special circumstances was true was required in order for Ayala to be eligible for the death penalty.

Jury selection began in San Diego in January, 1989. Each of the more than 200 potential jurors who responded to the summons and survived hardship screening was directed to fill out a 77-question, 17-page questionnaire. Over the next three months, the court and the parties interviewed each of the prospective jurors regarding his or her ability to follow the law, utilizing the questionnaires as starting points for their inquiry. Those jurors who had not been dismissed for cause were called back for general voir dire, at which smaller groups of jurors were questioned by both the prosecution and the defense. The parties winnowed the remaining group down to twelve seated jurors and six alternates through the use of peremptory challenges. Each side was allotted twenty peremptory challenges which could be used upon any of the twelve jurors then positioned to serve on the jury. After twelve seated jurors were finally selected, both parties were allotted an additional six peremptory challenges to be used in the selection of alternates. The prosecution employed seven of the 18 peremptory challenges it used in the selection of the seated jurors to dismiss each black or Hispanic prospective juror who was available for challenge, resulting in a jury that was devoid of any members of these ethnic groups. In response, Ayala, who is Hispanic, brought three separate motions pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), claiming that the prosecution was systematically excluding minority jurors on the basis of race.[1]

---

[1]The motions were technically made under *People v. Wheeler*, 22 Cal.3d 258 (1978), the California analogue to *Batson*. Because "a *Wheeler* motion serves as an implicit *Batson* objection," we characterize Ayala's motions, and the proceedings that followed, as being pursuant to *Batson*. *Crittenden v. Ayers*, 624 F.3d 943, 951 (9th Cir. 2010).

The defense made its first *Batson* motion after the prosecution challenged two black jurors. The trial court found that the defense had not yet established a prima facie case of racial discrimination, but nevertheless determined that it would require the prosecution to state its reasons for challenging the jurors in question. At the prosecutor's insistence, and despite the defense's objections, the court refused to let the defendant or his counsel be present at the hearing in which the prosecution set forth these reasons and the court determined whether they were legitimate.

The trial judge continued to employ this ex parte, in camera procedure to hear and consider the prosecutor's purported reasons for challenging minority jurors following the defense's second and third *Batson* motions. He did so despite his determination, by the third motion, that the defense had established a prima facie showing of racial discrimination.

Ultimately, the trial judge concluded that the prosecutor had proffered plausible race-neutral reasons for the exclusion of each of the seven minority jurors, and denied the defense's *Batson* motions. Although the ex parte *Batson* proceedings were transcribed, this transcript — and thus, the prosecution's proffered race-neutral reasons for striking the seven black and Hispanic jurors — were not made available to Ayala and his counsel until after the conclusion of the trial.

The jury convicted Ayala of all counts save a single attempted robbery count, and found true the special circumstance allegations. At the penalty phase, it returned a verdict of death.

Early in the process of jury selection, the trial judge had instructed the parties to return to the court all the questionnaires the prospective jurors had completed, and advised them that he would be "keeping the originals." At some point during or following the trial, however, all questionnaires, save those of the twelve sitting jurors and five alternates, were lost.

The questionnaires of four additional jurors — including the sixth alternate — were located in the defense counsel's files, but the remaining 193 questionnaires have never been located.

On direct appeal from his conviction, Ayala challenged the trial court's use of ex parte *Batson* proceedings, and claimed that the loss of the jury questionnaires deprived him of his right to a meaningful appeal of the denial of his *Batson* motion. A divided California Supreme Court upheld his conviction and sentence. *People v. Ayala*, 6 P.3d 193 (Cal. 2000). The majority held that the trial judge had erred in conducting the *Batson* proceedings ex parte. *Id.* at 204. It went on to hold, however, that any error was harmless beyond a reasonable doubt. *Id.* It also concluded that the loss of the questionnaires was harmless beyond a reasonable doubt. *Id.* at 208. In dissent, Chief Justice George, joined by Justice Kennard, expressed his disagreement with the majority's "unprecedented conclusion that the erroneous exclusion of the defense from a crucial portion of jury selection proceedings may be deemed harmless." *Id.* at 221 (George, C.J., dissenting). Ayala's petition for certiorari was denied by the United States Supreme Court on May 14, 2001. *Ayala v. California*, 532 U.S. 1029 (2001).

Ayala timely filed his federal habeas petition. The district court denied relief, but issued a Certificate of Appealability as to Ayala's *Batson*-related claims and his claim that the state had violated his Vienna Convention right to consular notification.[2] Ayala now appeals.

## II.

Ayala's petition is subject to the requirements of the Antiterrorism and Effective Death Penalty Act of 1996

---

[2]Because we conclude that Ayala is entitled to relief on his *Batson*-related claims, we need not decide whether the district court erred in rejecting his Vienna Convention claim.

(AEDPA). *See Kennedy v. Lockyer*, 379 F.3d 1041, 1046 (9th Cir. 2004). We may grant relief only if the last state court decision on the merits of Ayala's claim was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## III.

**[1]** "For more than a century, [the Supreme] Court consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause." *Georgia v. McCollum*, 505 U.S. 42, 44 (1992). *Batson v. Kentucky*, 476 U.S. 79 (1986), established the three-step inquiry used to determine whether this basic constitutional guarantee has been violated. First, the defendant must make a prima facie showing that the prosecution has exercised peremptory challenges in a racially discriminatory manner. *Id.* at 96. Such a showing can be made, as the trial judge concluded it was in Ayala's case, where the prosecution has engaged in a pattern of strikes against jurors of a particular race. *Id.* at 97. Second, once the defendant has made a prima facie showing, "the burden shifts to the State to come forward with a neutral explanation for challenging" the jurors. *Id.* Third, the trial court must then determine whether, taking into consideration the prosecutor's explanations for his conduct, "the defendant has established purposeful discrimination." *Id.* at 98.

Ayala contends that the exclusion of the defense from the proceedings in which the prosecution justified its strikes of the seven black or Hispanic jurors, and the trial court accepted those justifications, violated his right to the assistance of counsel and his right to be personally present and to assist in his defense, and prevented him from ensuring that the prosecution did not violate his fundamental right to a jury chosen

free from racial discrimination. Here, we need hold only that, in these circumstances, the exclusion of defense counsel during *Batson* steps two and three violated the Constitution.

## A.

The California Supreme Court, when confronted with Ayala's claim, concluded that the exclusion of defense from these proceedings was, in fact, erroneous. It observed that "it seems to be almost universally recognized that ex parte proceedings following a [*Batson*] motion . . . should not be conducted unless compelling reasons justify them." *Ayala*, 6 P.3d at 203. Although such "compelling reasons" might exist if the prosecution's justifications for its strikes require it to divulge "strategic information," the Court determined that "no matters of trial strategy were revealed" during the *Batson* proceedings in Ayala's case. *Id.* at 202-03. Accordingly, the Court concluded, the trial court had erred in excluding Ayala and his counsel from these proceedings — certainly as a matter of state law, and perhaps also as a matter of federal constitutional law. *Id.* at 204.

Because the California Supreme Court acknowledged that the trial court might have violated Ayala's federal constitutional rights, we do not apply § 2254(d)'s deferential standard to this aspect of the state court's decision. *See Porter v. McCollum*, 130 S.Ct. 447, 452 (2009) (reviewing de novo whether petitioner's counsel had been constitutionally deficient because state court had decided only that petitioner was not prejudiced by any deficiency); *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).[3] Section 2254(d) is, however, far from

_____

[3]We do, however, accord AEDPA deference to the state court's reason for ultimately denying Ayala's appeal: that he had not been prejudiced by the trial court's error. We also agree with the state's contention that AEDPA bars Ayala's argument that the exclusion of defense counsel from steps two and three of the *Batson* proceedings was structural error. *See infra* Part V.

the only obstacle a habeas petitioner must overcome in order for a federal court to consider on the merits his claim that he was deprived of his constitutional rights. Here, the state asserts, and the district court agreed, that Ayala's claim is barred by *Teague v. Lane*, 489 U.S. 288 (1989). "[I]n addition to performing any analysis required by AEDPA, a federal court considering a habeas petition must conduct a threshold *Teague* analysis when the issue is properly raised by the state." *Horn v. Banks*, 536 U.S. 266, 272 (2002).

Under *Teague*, a "new constitutional rule[ ] of criminal procedure" cannot be applied retroactively to cases on collateral review. 489 U.S. at 310 (plurality opinion). Thus, "[b]efore a state prisoner may upset his state conviction or sentence on federal collateral review, he must demonstrate as a threshold matter that the court-made rule of which he seeks the benefit is not 'new,' " but had been established at the time his conviction became final. *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997). "A holding constitutes a 'new rule' within the meaning of *Teague* if it 'breaks new ground,' 'imposes a new obligation on the States or the Federal Government,' or was not '*dictated* by precedent existing at the time the defendant's conviction became final.' " *Graham v. Collins*, 506 U.S. 461, 467 (1993) (quoting *Teague*, 489 U.S. at 301).[4]

## B.

**[2]** We hold that Ayala's claim does not require the retroactive application of a new constitutional rule of criminal procedure, and thus is not *Teague*-barred. At the time Ayala's conviction became final on May 14, 2001, it was established

---

[4]*Teague* is subject to two exceptions. *See Saffle v. Parks*, 494 U.S. 484, 494-95 (1990) (a "new rule" can be applied retroactively on collateral review if "the rule places a class of private conduct beyond the power of the State to proscribe," or if it constitutes a " 'watershed rule[ ] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding") (quoting *Teague*, 489 U.S. at 311). Neither party contends that either exception is applicable in this case.

that defense counsel must be permitted to be present and offer argument during *Batson* steps two and three when, as in Ayala's case, the proceedings do not require the prosecution to reveal confidential information or trial strategy.

In this Circuit, this rule was unequivocally "dictated by precedent," *Teague*, 489 U.S. at 301, long before Ayala's conviction became final, having been established in *United States v. Thompson*, 827 F.2d 1254 (9th Cir. 1987). In *Thompson*, we held that a district court had constitutionally erred when, after the defendant had established a prima facie case under *Batson*, the court permitted the prosecution to state the reasons for its peremptory strikes ex parte. Observing that *Batson* step two might sometimes require the prosecutor to "reveal confidential matters of tactics and strategy," we recognized that in some circumstances there might be "compelling" reasons to conduct the proceedings ex parte. *Id.* at 1258-59. We therefore declined to adopt an absolute rule holding that the defense must *always* be permitted to participate at *Batson* steps two and three. We held, however, that defense counsel must be permitted to be present and offer argument during *Batson* steps two and three if the prosecution's proffered race-neutral reason do not involve confidential or strategic information. *Id.* at 1258-59.[5]

Our decision in *Thompson* represented the straightforward application of two lines of Supreme Court precedent. The first line of precedent finds its source in the Sixth Amendment's guarantee of the right to counsel. Because "the plain wording

---

[5]The dissent suggests that, because *Thompson* declined to adopt an absolute rule regarding the exclusion of defense counsel from *Batson* steps two and three, its conclusion was "not . . . a binding rule" and "clearly advisory." Dissent at 10139. We are puzzled by this, almost as much as we are by the dissent's suggestion that because *Thompson* was not unanimous it does not have binding effect and we should follow Judge Sneed's dissent. In any event, many constitutional rules recognize exceptions — e.g., the exigency exception to the Fourth Amendment prohibition on warrantless searches — but that does not make the rules any less binding.

of" the Amendment "encompasses counsel's assistance when-
ever necessary to assure a meaningful 'defence,' " the Court
has long held that the right applies at all "critical" stages of
criminal proceedings. *United States v. Wade*, 388 U.S. 218,
224-25 (1967); *see also, e.g.*, *White v. Maryland*, 373 U.S. 59,
60 (1963); *Gideon v. Wainwright*, 372 U.S. 335, 345 (1963).
Ultimately, the right to counsel "has been accorded . . . 'not
for its own sake, but because of the effect it has on the ability
of the accused to receive a fair trial.' " *Mickens v. Taylor*, 535
U.S. 162, 166 (2002) (quoting *United States v. Cronic*, 466
U.S. 648, 658 (1984)). Foremost among the attributes of a fair
trial is the requirement that it be adversarial in nature: "[t]he
very premise of our adversary system of criminal justice is
that partisan advocacy on both sides of a case will best pro-
mote the ultimate objective that the guilty be convicted and
the innocent go free." *Herring v. New York*, 422 U.S. 853,
862 (1975). "The right to the effective assistance of counsel
is thus the right of the accused to require the prosecution's
case to survive the crucible of meaningful adversarial test-
ing." *Cronic*, 466 U.S. at 656. As we observed in *Thompson*,
"[t]he right of a criminal defendant to an adversary proceed-
ing is fundamental to our system of justice," and thus ex parte
proceedings are justifiable only as "uneasy compromises with
some overriding necessity." 827 F.2d at 1258.

*Batson* is the seminal case in the second line of precedent.
After setting out the three-stage framework used to determine
whether the prosecution has engaged in purposeful racial dis-
crimination in the selection of a jury, the *Batson* Court
declined "to formulate particular procedures to be followed
upon a defendant's timely objection to a prosecutor's chal-
lenges." 476 U.S. at 99. *Batson* made clear, however, that the
defendant bears the ultimate burden of persuasion. *Id.* at 98.
*Batson* also made clear that a court must consider "all relevant
circumstances" in deciding whether a defendant has met his
burden of persuasion — an inquiry that requires determining
whether a prosecutor's stated reasons for striking a particular
juror are race-neutral, and, if race-neutral, whether they are

his actual reasons. *Id.* at 96-99; *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

In *Thompson*, we recognized that the *Batson* framework leaves defense counsel with "two crucial functions" that it must be permitted to perform. 827 F.2d at 1260. The first function is "to point out to the district judge where the government's stated reason may indicate bad faith." *Id.* As we explained:

> For example, government counsel here excluded one of the jurors because he lived in defendant's neighborhood and wore jeans to court. This seems like a legitimate reason, unless a nonexcluded juror also wore jeans or other casual dress, or lived in the same neighborhood as the defendant. . . . [D]efense counsel might have been able to point out that the stated reasons were pretextual because others similarly situated were allowed to serve. In addition, defense counsel might have been able to argue that the reasons advanced by the prosecution were legally improper. . . . Of course, the district judge might be able to detect some of these deficiencies by himself, but that is not his normal role under our system of justice.

*Id.* The second function is to "preserve for the record, and possible appeal, crucial facts bearing on the judge's decision." *Id.* at 1261. As we reasoned in *Thompson*:

> All we have before us concerning this issue is the prosecutor's explanation of her reasons and the district judge's ruling. . . . [I]f we are to review the district judge's decision, we cannot affirm simply because we are confident he must have known what he was doing. We can only serve our function when the record is clear as to the relevant facts, or when defense counsel fails to point out any such facts after

learning of the prosecutor's reasons. . . . Here, the record's silence cannot be reassuring.

*Id.* Thus, we held, only with the presence and assistance of defense counsel can the trial judge and subsequent appellate judges properly evaluate whether the defense has met its burden of persuasion under *Batson*. Excluding the defense from the *Batson* proceedings without some compelling justification therefore violates the Constitution. *Id.* at 1259-61.[6]

**[3]** *Thompson* compels us to conclude that the rule Ayala seeks is not, under *Teague*, a "new" one. "[C]ircuit court holdings suffice to create a 'clearly established' rule of law under *Teague*." *Belmontes v. Woodford*, 350 F.3d 861, 884 (9th Cir. 2003) (reversed on other grounds by *Brown v. Belmontes*, 544 U.S. 945 (2005)); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., for the Court) ("With one caveat, whatever would qualify as an old rule under our *Teague* jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the United States' under § 2254(d)(1). . . . The one caveat, as the statu-

---

[6]The state and the dissent, in arguing that Ayala's claim is barred by *Teague*, cite *Lewis v. Lewis*, 321 F.3d 824 (9th Cir. 2003), a case in which we granted a habeas petitioner's *Batson* claim. In the course of some extended musings regarding the "ideal procedures under *Batson*," *id.* at 830, the *Lewis* panel observed, in a footnote, that the argument that "a court must allow defense counsel to argue" at *Batson* step three was not "clearly established law," as it "appears not to have been addressed by courts." *Id.* at 831 n.27. This passage is dicta, as the question of whether defense counsel must be permitted to argue at *Batson* step three was not "presented for review" in *Lewis. Barapind v. Enomoto*, 400 F.3d 744, 750-51 (9th Cir. 2005) (en banc) (per curiam). Indeed, this passage could not represent anything *but* dicta, as the *Lewis* panel could not overrule our prior decision in *Thompson*, of which it was apparently unaware. *See Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc) (holding that a prior panel's decision may only be overruled by a subsequent panel if the decision is "clearly irreconcilable" with a higher court's intervening ruling). *Thompson*'s holding thus unquestionably remains binding Circuit law.

tory language makes clear, is that § 2254(d)(1) restricts the source of clearly established law to this Court's jurisprudence."). We have held that, as long as a rule derived from Supreme Court precedent was established in *this* Circuit when a petitioner's conviction became final, it is not a "new rule" under *Teague*. *See Belmontes*, 350 F.3d at 884; *Bell v. Hill*, 190 F.3d 1089, 1092-93 (9th Cir. 1999). "This is true even [if] other federal courts and state courts have rejected our holding." *Bell*, 190 F.3d at 1093. Because *Thompson* itself relied on the Supreme Court's right to counsel and equal protection jurisprudence, "we cannot now say that a state court would not have felt compelled by the Constitution and Supreme Court precedent" to conclude that the rule Ayala contends must be applied was not established at the time his conviction became final. *Id.*

## C.

We would hold that Ayala's claim is not *Teague*-barred even if we were free to conclude that, contrary to *Bell* and *Belmontes*, *Thompson* did not in and of itself establish that the rule Ayala seeks is not "new." Nearly every court to consider the question by the time Ayala's conviction became final had adopted the rule that we set forth in *Thompson*, concluding that defense counsel must be allowed to participate at *Batson* steps two and three except when confidential or strategic reasons justify the challenge. The Fourth, Eight and Eleventh Circuits had all so held. *See United States v. Garrison*, 849 F.2d 103, 106 (4th Cir. 1988) ("We . . . agree with the Ninth Circuit that the important rights guaranteed by *Batson* deserve the full protection of the adversarial process except where compelling reasons requiring secrecy are shown."); *United States v. Roan Eagle,* 867 F.2d 436, 441 (8th Cir. 1989) ("[O]nce the prosecutor has advanced his racially neutral explanation, the defendant should have the opportunity to rebut with his own interpretation."); *United States v. Gordon*, 817 F.2d 1538, 1541 (11th Cir. 1987) (remanding for an evidentiary hearing where the district court had denied the defen-

dant's request for a hearing to rebut the government's proffered race-neutral reasons). The state courts that confronted the issue had all reached similar conclusions. *See Ayala*, 6 P.3d at 203; *Goode v. Shoukfeh*, 943 S.W.2d 441, 452 (Tex. 1997); *People v. Hameed*, 88 N.Y.2d 232, 238 (1996); *State v. Hood*, 245 Kan. 367, 378 (1989); *Gray v. State*, 317 Md. 250, 257-58 (1989); *Commonwealth v. Jackson*, 386 Pa. Super. 29, 51 (1989); *Commonwealth v. Futch*, 38 Mass. App. Ct. 174, 178 (1995); *see also Caspari v. Bohlen*, 510 U.S. 383, 395 (1994) ("[I]n the *Teague* analysis the reasonable views of state courts are entitled to consideration along with those of federal courts.").

These courts adopted the *Thompson* rule with good reason. The Sixth Amendment provides that the defendant must be permitted to have the assistance of a trained advocate at all critical stages of the proceedings in order to test and challenge all aspects of the prosecution's case. *See Cronic*, 466 U.S. at 656. *Batson* did not suggest that there should be an *exception* to this overarching rule when a defendant has established a prima facie case that the prosecutor has struck jurors on the basis of race. To the contrary, it makes no sense to put the burden of persuasion on the defense, as *Batson* does, and then refuse defense counsel the opportunity to hear and respond to the prosecution's explanations. The rule Ayala seeks is not in any sense new, but rather one which, as almost all courts to have considered the question have concluded, follows directly from the more general rule that the defendant has the right "to require the prosecution's case to survive the crucible of meaningful adversarial testing." *Id.*; *see also Wright v. West*, 505 U.S. 277, 308-09 (1992) (Kennedy, J., concurring in the judgment) ("Where the beginning point is a rule of . . . general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent.").

The state and the dissent call our attention to two decisions that reached a contrary conclusion, both of which were decided soon after the Court issued *Batson*. In *United States v. Davis*, the Sixth Circuit rejected a defendant's argument that his right to be present had been violated when the trial court allowed the prosecution to explain its peremptory strikes in camera, holding that "the district court was entitled to hear from the Government under whatever circumstances the district court felt appropriate." 809 F.2d 1194, 1202 (6th Cir. 1987). Similarly, in *United States v. Tucker*, the Seventh Circuit held that the Sixth Circuit was correct to conclude that "*Batson* neither requires rebuttal of the government's reasons by the defense, nor does it forbid a district court to hold an adversarial hearing." 836 F.2d 334, 340 (7th Cir. 1988).[7]

These decisions do not render Ayala's claim *Teague*-barred. "[T]he standard for determining when a case establishes a new rule is 'objective,' and the mere existence of conflicting authority does not necessarily mean a rule is new." *Williams*, 529 U.S. at 410 (quoting *Wright*, 505 U.S. at 304 (1992) (O'Connor, J., concurring in the judgment)). To the extent that these decisions deny that there is any right to participate in *Batson* proceedings, they simply cannot be reconciled with the basic Sixth Amendment requirement that, at all critical stages of criminal proceedings, the defendant must

---

[7]The state and the dissent also cite a third decision that they contend demonstrates that there is a Circuit split that precludes our finding that the rule Ayala seeks was "dictated by precedent." In *Majid v. Portuondo,* where the issue was whether the defense had the right to cross-examine witnesses at a *Batson* hearing, the Second Circuit remarked gratuitously that "[i]t remains at least arguable that courts holding *Batson* hearings may . . . hear the [prosecution's] explanations *in camera* and outside the presence of the defendants." 428 F.3d 112, 128 (2d. Cir. 2005). The question of whether a challenge to the type of in camera hearing conducted in Ayala's case is *Teague*-barred was not, however, before the court. Moreover, this passage in *Majid* can be understood as observing only that there is no *absolute* right to an adversarial proceeding, which is consistent with the rule that Ayala seeks here.

have the assistance of counsel in order to subject the prosecution's case to adversarial testing. That the courts in *Davis* and *Tucker* failed to fully appreciate the relevance of this principle is understandable, as in neither case did the defendants invoke the right to counsel to support their claim: in *Davis*, the defendants asserted that the in camera hearings had violated *their* right to be present at trial, a right derived principally from the Sixth Amendment's Confrontation Clause, *see Davis*, 809 F.2d at 1200; in *Tucker*, the defendant claimed that the ex parte proceedings violated his rights to due process and to an impartial jury, *see Tucker*, 836 F.2d at 338, 340. Perhaps for this reason, the *Davis* court failed to recognize the important functions counsel serves during *Batson* steps two and three, instead concluding that once the defense had established a prima facie case of racial discrimination, its "participation was no longer necessary for the district court to make its determination." 809 F.2d at 1202. As we explained in *Thompson*, this statement is simply not true: defense counsel continues to serve the two crucial functions of bringing facts and arguments to the attention of the trial court and preserving them for the record. *Thompson*, 827 F.2d at 1260-61. Likewise, the court in *Tucker* rejected the rule we adopted in *Thompson* because it concluded that *Batson* itself did not require the defense to be present during *Batson* steps two and three, and because our exception permitting ex parte proceedings in some circumstances threatened to "swallow the rule." *See Tucker*, 836 F.2d at 338, 340. Our rule is not, however, derived directly from *Batson*, but rather from the confluence of *Batson* and the Court's Sixth Amendment jurisprudence. Moreover, simply because a rule is subject to an exception — perhaps even a relatively broad exception — is not a justification for rejecting the rule altogether when the result, in those cases in which the exception does not apply, is to deprive a defendant of his constitutional rights.[8]

---

[8]*Tucker* itself may be read to recognize this point, as it did not explicitly reject our conclusion that an adversarial hearing at *Batson* steps two and three was sometimes constitutionally compelled. *Id.* at 340. It observed that, in general, "adversarial hearings are the most appropriate method for

Even assuming some doubt may have existed as to whether the rule Ayala seeks was "dictated by precedent" in the immediate aftermath of the Sixth and Seventh Circuits' decisions in 1987 and 1988, by the time Ayala's conviction became final in 2001, 13 years later, every court to have considered the issue in the interim — state and federal — had rejected, either explicitly or implicitly, the Sixth and Seventh Circuits' view, and had adopted the *Thompson* rule. *See Garrison*, 849 F.2d at 106; *Roan Eagle,* 867 F.2d at 441; *Ayala*, 6 P.3d at 203; *Goode*, 943 S.W.2d at 452; *Hameed*, 88 N.Y.2d at 238; *Hood*, 245 Kan. at 378; *Gray*, 317 Md. at 257-58; *Jackson*, 386 Pa. Super. at 51; *Futch*, 38 Mass. App. Ct. at 178. The Supreme Court had also, in the interim, acknowledged a version of our rule when it observed (in dicta) that, when a prosecutor challenges a defendant's use of peremptory challenges, "[i]n the rare case in which the explanation for a challenge would entail confidential communications or reveal trial strategy, an *in camera* discussion can be arranged." *Georgia v. McCollum*, 505 U.S. 42, 58 (1992). Thus, the California Supreme Court characterized the rule Ayala sought — the *Thompson* rule — as one that had been "almost universally recognized." *Ayala*, 6 P.3d at 203. Given that the California Supreme Court's description is correct, the rule that Ayala would have us apply is not *Teague*-barred.[9]

---

handling most *Batson*-type challenges." *Id.* Thus, although the *Tucker* court purported to reject *Thompson* in favor of *Davis*, the decision did not necessarily foreclose defendants from claiming their rights had been violated by the trial court's employment of a nonadverserial *Batson* proceeding.

[9]We also note that where, as here, the state court applied the rule in question on direct appeal, and determined it to be "almost universally recognized," the application of *Teague* to bar the petitioner's claims would do little to further the doctrine's purpose. *Teague* is motivated by considerations of comity and finality. *See Teague*, 489 U.S. at 308. Its purpose is to afford repose to the states by ensuring that criminal convictions that were valid at the time they became final will not be upset by subsequently discovered constitutional rules. As Justice O'Connor explained, applying new rules on collateral review

**[4]** Accordingly, we conclude that, at the time Ayala's conviction became final, it was established for purposes of *Teague* that defense counsel cannot be excluded from *Batson* steps two and three absent some "compelling justification" for doing so. *Thompson*, 827 F.2d at 1259-60. The California Supreme Court held that this rule was violated in Ayala's case. It found, and the state does not dispute, that "no matters of trial strategy were revealed" in the hearings at which the prosecution explained its reasons for its peremptory challenges of all the potential black and Hispanic jurors. *Ayala*, 6 P.3d at 203.[10] Thus, the exclusion of defense counsel was in

---

> *continually* forces the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then existing constitutional standards. Furthermore, as we recognized in *Engle v. Isaac*, "[s]tate courts are understandably frustrated when they faithfully apply existing constitutional law only to have a federal court discover, during a [habeas] proceeding, new constitutional commands." [456 U.S. 107, 128 n.33 (1982).]

*Id.* at 310. Although *Teague* may still bar the application in federal habeas proceedings of rules that the state courts have themselves recognized, *cf. Beard v. Banks*, 542 U.S. 406, 413 (2004), *Horn*, 536 U.S. at 272, the interests of comity and finality are obviously far less weighty when a state court has accepted a rule than when it has rejected or ignored a rule. Here, the state is not being forced to marshal resources to defend against a new and novel claim that was not recognized at the time the conviction became final; nor did it faithfully apply existing constitutional law only to have a federal court subsequently apply new constitutional commands. To the contrary, the state is challenging a rule that the California Supreme Court found to be well established and controlling at the time it affirmed Ayala's conviction on direct appeal, as well as at the time the trial court conducted its proceedings. Certainly the state court could not be "frustrated" to find that a federal court determined that it was error to exclude the defense from the *Batson* proceedings when the state court itself had held that this very same rule was "almost universally recognized" and reached the same determination itself.

[10]The dissent attempts to reframe the *Teague* analysis as follows: *Thompson* merely articulated the rule that defense counsel could not be excluded without "compelling" justification; it was not until after Ayala's

violation of the Constitution, and the only remaining question as to that aspect of the case is whether the constitutional error was prejudicial.

## IV.

Ayala also claims that the state's loss of an overwhelming majority of the jury questionnaires deprived him of a record adequate for appeal. As the California Supreme Court recognized, Ayala has a due process right to a record sufficient to allow him a fair and full appeal of his conviction. *Id.* at 208 (citing *People v. Alvarez*, 14 Cal. 4th 155, 196 n.8 (1996)). If a state provides for a direct appeal as of right from a criminal conviction, it must also provide "certain minimum safeguards necessary to make that appeal 'adequate and effective.' " *Evitts v. Lucey*, 469 U.S. 387, 392 (1985) (quoting *Griffin v. Illinois*, 351 U.S. 12, 20 (1956)); *see also Coe v. Thurman*, 922 F.2d 528, 530 (9th Cir. 1990) ("Where a state guarantees the right to a direct appeal, as California does, the state is required to make that appeal satisfy the Due Process Clause.").

---

conviction became final that courts recognized that the prosecutor's explanation in this case (i.e., not revealing his strategy to the defense) was "not a valid reason not to follow the norm of an adversarial proceeding." Dissent at 10141.

To the contrary, *Thompson* directly addressed the government's argument that "an adversary hearing is inappropriate because the government lawyer is required to reveal confidential matters of tactics and strategy." *Thompson*, 827 F.2d at 1259. In that case, we rejected this claim as a general proposition and held that the determination of whether revealing case strategy could be a compelling justification in a particular case must be determined by examining whether the facts in that case warranted an exception to the general rule. *Id.* Rules applied on a case-by-case basis do not raise *Teague* issues. *See Wright v. West*, 505 U.S. 277, 308 (1992) (Kennedy, J., concurring) ("If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule.").

**[5]** In *Boyd v. Newland*, we applied these principles in granting the habeas petition of an indigent defendant who had been denied a copy of his voir dire transcript because the state court had, in violation of clearly established federal law, determined that the transcript was not necessary to his *Batson* appeal. 467 F.3d 1139 (9th Cir. 2006). We held that "all defendants . . . have a right to have access to the tools which would enable them to develop their plausible *Batson* claims through comparative juror analysis." *Id.* at 1150. It follows that if the state's loss of the questionnaires deprived Ayala of the ability to meaningfully appeal the denial of his *Batson* claim, he was deprived of due process.[11]

This conclusion is not called into question by *Briggs v. Grounds*, 682 F.3d 1165 (9th Cir. 2012), cited in the dissent. Dissent at 10151. In *Briggs*, the petitioner had complete access to the juror questionnaires during the course of his state appeal. In fact, he relied heavily on them in presenting a comparative juror analysis to support his *Batson* claim. 682 F.3d at 1171. Thus Briggs's due process rights were not implicated. The language cited by the dissent is lifted from a section of the opinion discussing whether, because those questionnaires were not included in the federal court record, we should credit the petitioner's characterization of those questionnaires over the state court's characterization. *Briggs* is irrelevant for our purposes, i.e., whether Ayala's due process rights were implicated when California lost the juror questionnaires, thus rendering them unavailable for his *state court* appeal.

---

[11]The dissent ignores the holding of *Boyd* and instead plucks the words "voir dire transcript" out of the opinion to argue that *only* a voir dire transcript is necessary for comparative juror analysis. Dissent at 10150. If our dissenting colleague believes that jury questionnaires are not tools for comparative juror analysis, we point her to *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 256-57 (2005) and *Kesser v. Cambra*, 465 F.3d 351, 360 (9th Cir. 2006) (en banc), both of which utilized juror questionnaires in comparative juror analysis.

**[6]** Ayala is entitled to relief on this claim only if the loss of the questionnaires was prejudicial *in se*, or if it in conjunction with the *Batson* error discussed *supra* served to deprive him of a meaningful appeal. *Id.*; *see also Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). "[I]n analyzing prejudice . . . , this court has recognized the importance of considering the cumulative effect of multiple errors and not simply conducting a balkanized, issue-by-issue harmless error review." *Daniels v. Woodford*, 428 F.3d 1181, 1214 (9th Cir. 2005) (quoting *Thomas v. Hubbard*, 273 F.3d 1164, 1178 (9th Cir. 2001)). Here, the loss of the questionnaires increased the prejudice that Ayala suffered as a result of the exclusion of defense counsel from *Batson* steps two and three, as it further undermined his ability to show that *Batson* had been violated. Accordingly, in determining whether Ayala is entitled to relief, we evaluate the prejudice caused by the loss of the questionnaires in conjunction with the harm caused by excluding defense counsel from the *Batson* proceedings.[12]

## V.

The California Supreme Court held that Ayala was not prejudiced by the trial court's exclusion of the defense from the *Batson* proceedings, by the state's loss of the vast majority of the jury questionnaires, or by the two errors considered together. The Court declared itself "confident that the challenged jurors were excluded for proper, race-neutral reasons," *Ayala*, 6 P.3d at 204, concluded that the exclusion of defense counsel was "harmless beyond a reasonable doubt," *id.* (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)), and held that despite the loss of the questionnaires the record was "sufficiently complete for [it] to be able to conclude that [the struck jurors] were not challenged and excused on the basis of forbidden group bias." *Id.* at 208.

---

[12]Ayala also asserts that there is an Eighth Amendment right to appeal — and to a record adequate for appeal — in a capital case. *See Whitmore v. Arkansas*, 495 U.S. 149, 168 (1990) (Marshall, J., dissenting). We need not decide this question here.

We now address these same questions, and hold that *Brecht v. Abrahamson*, 507 U.S. 619 (1993), requires us to reach a different conclusion.

### A.

Ayala claims, first, that exclusion of defense counsel from the *Batson* proceedings necessarily represented structural error, and that he is entitled to relief without further inquiry into whether he was prejudiced. The state court's conclusion that the error here was not structural — a conclusion implicit in its application of the *Chapman* harmless error standard to evaluate whether Ayala had suffered prejudice — is subject to review under the deferential standard of § 2254(d). *See Byrd v. Lewis*, 566 F.3d 855, 862 (9th Cir. 2009).

**[7]** The Supreme Court has defined as "structural" an error that affects "the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Where this line is drawn is not always clear. *Compare, e.g.*, *Waller v. Georgia*, 467 U.S. 39, 49 n.9 (1984) (violation of the right to public trial requires automatic reversal), *with, e.g., Rushen v. Spain*, 464 U.S. 114, 117-18 & n.2 (1983) (denial of a defendant's right to be present at trial is subject to harmless error review). While a violation of *Batson* is itself structural error, there is no Supreme Court decision addressing whether the exclusion of defense counsel from *Batson* proceedings constitutes structural error.

Ayala contends, however, that the state court's decision represents an unreasonable application of the Supreme Court's clearly established rule that "no showing of prejudice need be made 'where assistance of counsel has been denied entirely or during a critical stage of the proceedings.' " Brief of Appellant at 22 (quoting *Mickens v. Taylor*, 535 U.S. 162, 166 (2002)); *see also United States v. Cronic*, 466 U.S. 648,

659 n.25 (1984).[13] The use of the phrase "critical stage" in this excerpt can be somewhat misleading: although the *Batson* proceedings represented a "critical stage" in the sense that Ayala had the right to counsel during those proceedings, they were not necessarily the sort of "critical stage" at which the deprivation of that right constituted structural error. *See United States v. Owen*, 407 F.3d 222, 227 (4th Cir. 2005). As the Fourth Circuit has explained, the statements in *Mickens* and *Cronic*

> rely on the Supreme Court's earlier usage of the phrase "critical stage," in cases such as *Hamilton v. [Alabama*, 368 U.S. 52 (1961)] and *White* [*v. Maryland*, 373 U.S. 59 (1963) (per curiam)] to refer narrowly to those proceedings both at which the Sixth Amendment right to counsel attaches and at which denial of counsel necessarily undermines the reliability of the entire criminal proceeding. . . . [T]he Supreme Court has subsequently used the phrase "critical stage," in cases such as *[United States v.] Wade* [, 388 U.S. 218 (1967)] *and Coleman* [*v. Alabama*, 399 U.S. 1 (1970)], in a broader sense, to refer to all proceedings at which the Sixth Amendment right to counsel attaches — including those at which the denial of such is admittedly subject to harmless-error analysis.

*Id.* at 228 (emphasis omitted).

In *Musladin v. Lamarque,* we held that the "clearly established" rule of *Cronic* is that a "critical stage" where the deprivation of counsel constitutes structural error is one that holds "significant consequences for the accused." 555 F.3d 830, 839 (9th Cir. 2009) (quoting *Bell v. Cone*, 535 U.S. 685,

---

[13]As the state observes, although *Mickens* postdates the California Supreme Court's decision, the opinion simply restates the rule set forth 18 years prior in *Cronic*.

695-96 (2002)). We identified as providing guidance in this inquiry Supreme Court decisions holding an overnight trial recess and closing arguments to be two such critical stages. *Id.* at 839-40 (citing *Geders v. United States*, 425 U.S. 80 (1976) and *Herring v. New York*, 422 U.S. 853 (1975)).

**[8]** Given this fairly ambiguous standard, it was not an unreasonable application of clearly established federal law for the California Supreme Court to conclude that the exclusion of the defense from *Batson* steps two and three does not amount to a deprivation of the right to counsel such that the likelihood that the jury was chosen by unconstitutional means is "so high that a case-by-case inquiry is unnecessary." *Mickens*, 535 U.S. at 166. As the state points out, it would be somewhat incongruous to conclude that the exclusion of counsel during *Batson* proceedings is a defect in the very structure of the trial if the same exclusion would be permissible were there some reason to keep the prosecution's justifications confidential. Thus, a "fairminded jurist[ ]," *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)), might conclude that *Batson* steps two and three are not a *Cronic*-type "critical stage." Even if we would hold the error to be structural were we to consider the issue de novo, we cannot say that, as the Supreme Court has construed AEDPA, the state court's contrary conclusion was unreasonable. *See Musladin*, 555 F.3d at 842-43.

## B.

**[9]** Ayala claims next that, even if the trial court's exclusion of the defense was not the sort of constitutional error *in se* that requires that we presume that in every exclusion case prejudice ensued, it was prejudicial in *his* case, especially when considered in conjunction with the loss of the questionnaires. In evaluating whether a trial error prejudiced a state habeas petitioner, we must apply the standard set forth in *Brecht v. Abrahamson*, granting relief only if the error had a

"substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). We "apply the *Brecht* test without regard for the state court's harmlessness determination." *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010) (citing *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007)).[14]

The *Brecht* standard has been described as follows:

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.

*Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011) (quoting *Kotteakos*, 328 U.S. at 765). "Where the record is so evenly

---

[14]If this appeal had come before us prior to the Supreme Court's decision in *Fry*, we would have instead asked whether the state court's determination that any error was harmless under *Chapman* was contrary to, or an unreasonable application, of federal law. *See Inthavong v. Lamarque*, 420 F.3d 1055, 1059 (9th Cir. 2005). *Fry* clarified, however, that *Brecht* is the harmless error standard to be applied in such circumstances because the *Brecht* standard "subsumes" the "more liberal" § 2254(d)/*Chapman* standard. *See Fry*, 551 U.S. at 120; *Merolillo*, 663 F.3d at 454. In other words, if a federal habeas court determines that the *Brecht* standard has been met, it also necessarily determines to be an unreasonable application of *Chapman* a state court's conclusion that the error was harmless beyond a reasonable doubt. In holding that Ayala has demonstrated his entitlement to relief under *Brecht*, we therefore also hold to be an unreasonable application of *Chapman* the California Supreme Court's conclusion that Ayala was not prejudiced by the exclusion of the defense during *Batson* steps two and three or by the loss of the questionnaires. *See Merolillo*, 663 F.3d at 458-59.

balanced that a judge 'feels himself in virtual equipoise as to the harmlessness of the error' and has 'grave doubt about whether an error affected a jury [substantially and injuriously], the judge must treat the error as if it did so.' " *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435, 437-38 (1995)) (alteration in original) (internal quotations omitted).[15]

---

[15]The dissent contends that *Brecht* no longer provides the proper standard of review for assessing prejudice, arguing instead that "a writ may issue only if we determine that no fairminded jurist could find that the exclusion of defense counsel and the loss of questionnaires did not prevent Ayala from prevailing on his *Batson* claim." Dissent at 10149. The dissent's only authority for its conclusion is *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011), which the dissent claims "refined" the *Brecht* test. Dissent at 10148.

At the same time that the dissent accuses us of "extending each supporting argument just slightly beyond its limitations," Dissent at 10135, the dissent does far worse in applying Harrington to prejudice analysis under AEDPA. In *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007), the Supreme Court held that *Brecht* is the proper test for prejudice analysis under AEDPA. In *Harrington*, handed down just four years later, the Supreme Court did not once mention *Fry* or *Brecht*. Furthermore, the Court's reference to "fairminded jurist" was *not* in the context of reviewing a state court's prejudice determination but rather in the context of whether a state court's determination regarding constitutional error was unreasonable. 131 S. Ct. at 785. (Here, of course, error is conceded and only prejudice is at issue.) The dissent thus seems willing to conclude that the Supreme Court radically "refined" *Brecht*, a nearly two-decade old precedent — a case with central import in virtually all federal habeas adjudication, reaffirmed just five years ago in *Fry* — without even a mention of that oft-cited case. As if recognizing the futility of its argument, the dissent characterizes its authority as "the essence of the Supreme Court's holdings." Dissent at 10149. We do not know what this "essence" is, but there is no legal basis for the dissent's conclusion that a case cited almost 10,000 times to determine prejudice in habeas cases was sub silentio drastically overhauled in a discussion unrelated to prejudice.

Additionally, in the eighteen months since *Harrington* was handed down, we have repeatedly applied the "unrefined" *Brecht* test to assess prejudice in habeas cases. *E.g.*, *Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011); *Ybarra v. McDaniel*, 656 F.3d 984, 995 (9th Cir. 2011); *United States v. Rodrigues*, 678 F.3d 693, 695 (9th Cir. 2012). In some cases, we have cited *Harrington* in analyzing constitutional error but then, properly, applied the traditional *Brecht* test when determining prejudice. *E.g.*,

**[10]** We conclude that Ayala has met the *Brecht* standard. The prejudice he suffered was the deprivation of the opportunity to develop, present, and likely prevail on his *Batson* claim. Had he prevailed on his *Batson* claim, and shown that the prosecution acted upon impermissible considerations of race in striking even one of the seven black or Hispanic jurors it struck, then, as the state acknowledged in oral argument before this court, we would be compelled to reverse Ayala's conviction because his entire trial would have been infected by this violation of the Constitution. *See Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986); *Boyd*, 467 F.3d at 1150. The question, then, is whether Ayala could have made this showing but for the state's constitutional errors. If we cannot say that the exclusion of defense counsel and the loss of the questionnaires likely did not prevent Ayala from prevailing on his *Batson* claim, then we must grant the writ.

**[11]** Here, it is probable that the state's errors precluded Ayala from turning what is a very plausible *Batson* claim — the challenge to the prosecution's strikes of all minority jurors — into a winning one by preventing defense counsel from performing the two "crucial functions" we identified in *Thompson*. First, Ayala's counsel could have pointed out where the prosecution's purported justifications might be pretextual or indicate bad faith. Although the trial judge may have been able to "detect some of these deficiencies by himself, . . . there might be arguments [he] would overlook"

---

*Ocampo v. Vail*, 649 F.3d 1098, 1106 (9th Cir. 2011); *Schneider v. McDaniel*, 674 F.3d 1144, 1149-50 (9th Cir. 2012). Thus, even if we believed that the dissent were correct that *Harrington* rewrote the test for prejudice (a conclusion that is wholly without support and that we unequivocally reject), this three-judge panel, like all others, is nevertheless required to apply *Brecht* as it was (and is), because such is the law of the circuit. Lacking support in both Supreme Court and Ninth Circuit case law, the dissent's pronouncement simply amounts to a preference that the prejudice standard under AEDPA should be far more onerous than current law provides.

because he was "unassisted by an advocate." *Thompson*, 827 F.2d at 1260-61. The jury selection process took over three months and comprises more than six thousand pages of the record. The trial judge, attempting to evaluate the prosecution's reasons for striking the jurors in light of this massive amount of information, was almost certain to forget or overlook key facts, but could have been substantially aided by the presence of participants in the process adverse to the prosecution. In particular, Ayala's lawyers could have pointed out when the prosecutor's proffered reason for striking a black or Hispanic juror applied "just as well to an otherwise-similar nonblack [or non-Hispanic] who [was] permitted to serve." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). The Supreme Court has emphasized the importance of this sort of "comparative juror analysis" to determining whether a prosecutor's reasons for challenging a minority juror were pretextual. *Id.*; *see also Snyder v. Louisiana*, 552 U.S. 472, 483-85 (2008). Although Ayala can — and does — still raise some of these arguments on appeal, he was deprived of the crucial opportunity to present them to the institutional actor best positioned to evaluate them. As the Supreme Court has observed, appellate courts must accord deference to "trial court findings on the issue of discriminatory intent" because "the finding largely will turn on evaluation of credibility." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (quoting *Hernandez v. New York*, 500 U.S. 352, 366 (1991) (plurality opinion)) (internal quotation marks and citations omitted). Because, after finding a prima facie case of a *Batson* violation, the trial court was not made aware of key facts that could have influenced his credibility determination, there is substantial reason to doubt that Ayala's *Batson* challenge was properly denied.

**[12]** Second, Ayala's counsel could have "preserve[d] for the record, and possible appeal, crucial facts bearing on the judge's decision." *Thompson*, 827 F.2d at 1261. We cannot know many of the facts material to whether the prosecution's stated reasons were false, discriminatory or pretextual because defense counsel was not able to preserve relevant facts

regarding prospective jurors' physical appearances, behavior, or other characteristics. Although the trial judge could have been aware of these facts, an appellate court "can only serve [its] function when the record is clear as to the relevant facts, or when defense counsel fails to point out any such facts after learning of the prosecutor's reasons." *Id.*; *see also United States v. Alcantar*, 897 F.2d 436, 438 (9th Cir. 1990) (reversing a defendant's conviction where the *Batson* proceedings conducted below left the defense unable "to adequately challenge the prosecution's reasons as pretextual" and left the reviewing court uncertain as to whether the prosecution had, in fact, violated *Batson*).

[13] This second deficiency is greatly augmented by the loss of the jury questionnaires. The only questionnaires that have been preserved are those of the seated and alternate jurors.[16] We are unable to evaluate the legitimacy of some of the prosecution's proffered reasons for striking the black and Hispanic jurors because they referred to questionnaires that are now lost. The loss of the questionnaires also leaves us lacking potentially crucial information about certain individuals who were neither the subject of Ayala's *Batson* challenge nor ultimately served as jurors.[17] Thus, we cannot perform a fair com-

---

[16]There are also three other questionnaires out of more than 200 which were somehow located, but have no particular significance with respect to a comparative juror analysis.

[17]The state and the dissent both appear to presume that the only relevant comparisons in a comparative juror analysis are between the struck jurors and the jurors who are ultimately seated, but *Miller-El* made clear that the otherwise-similar jurors to whom the struck jurors can be compared include those "permitted to serve" by the prosecution but ultimately struck by the defense. *See, e.g.*, *Miller-El v. Dretke*, 545 U.S. at 244-45 (comparing a struck juror to a juror not challenged by the prosecution who was later challenged by the defense). This, of course, makes perfect sense: some of these jurors were not struck by the defense until after the prosecution had passed them for several rounds, and the "underlying question is not what the defense thought about these jurors," but what the prosecution did. *Id.* at 245 n.4.

parative juror analysis as required by *Batson. See Miller-El v. Dretke*, 545 U.S. at 241.

Even so, we have substantial reason to question the motivation of the prosecution in engaging in its peremptory challenges of the black and Hispanic jurors. In conducting our inquiry, we must keep in mind the strength of Ayala's prima facie case. "[T]he statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors." *Miller-El v. Cockrell*, 537 U.S. at 342. That the prosecution struck each of the seven black or Hispanic jurors available for challenge establishes a basis for significant doubt of its motives: "[h]appenstance is unlikely to produce this disparity." *Id.*

**[14]** Perhaps more important, the analysis of the prosecution's motives that is possible on the partial record before us demonstrates that many of its stated reasons for striking the seven black and Hispanic jurors were or may have been false, discriminatory or pretextual. There are good reasons to think that race motivated the prosecution's strikes of at least three, if not more, jurors: Olanders D., Gerardo O. and Robert M.[18]

---

[18]Although the record provides somewhat less reason to conclude that the prosecution's justifications for the strikes of the four other black and Hispanic jurors were pretextual, race may also have played a substantial role in these challenges. For example, Ayala might have been able to show that the prosecution violated *Batson* when it struck Hispanic juror George S. in the final round of peremptory challenges. The prosecution gave five reasons for striking George S. The first reason — that his application to be a police officer some twenty years prior had been rejected — applied equally to seated white juror Charles C. The second reason — that he had indicated some discomfort with the death penalty — did not significantly distinguish him from a number of seated white jurors. *See infra* Section V.B.2. The third reason — that he had been a "holdout" on a prior jury — could have been called into question had defense counsel been able to point out that the jury on which George S. had been a "holdout" was a civil one, that the issue in dispute had been the assessment of damages, and that unanimity was not required. The fourth reason — that he had written in his questionnaire that the parties probably would not want him

We "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole," *Kotteakos*, 328 U.S. at 765, that Ayala was not prevented from showing that the prosecution struck at least one of these jurors because of his race.

## 1.  Olanders D.

Olanders D. was one of two black jurors whom the prosecution struck in the first round of peremptory challenges. During the in camera hearing that followed the defense's *Batson* motion, the prosecutor explained that he struck Olanders D. because: (1) he might not be able to vote for the death penalty, as he had written in his questionnaire that he did not believe in it, and he had indicated in questioning that his view had recently changed; (2) his answers to voir dire questions often were not fully responsive; (3) his questionnaire responses had been "poor"; and (4) he might lack the "ability to fit in with a cohesive group of 12 people." The trial judge rejected one of the four proffered reasons — his purported inability "to fit in with a cohesive group of 12 people." The presence of defense counsel, and the preservation of the questionnaires, could have permitted Ayala to call into question all three of the reasons that the court accepted as legitimate.

First, in response to the prosecution's claim that it was concerned that Olanders D. would hesitate to impose the death penalty, defense counsel could have pointed to seated white jurors who had expressed similar or greater hesitancy. One seated juror in particular was indistinguishable from Olanders D. in this regard. Olanders D. had (apparently) written in his

_____

to serve as a juror — overlapped entirely with the third reason, as George S. had explained that he wrote that the parties might not want him as a juror because he had been a civil jury "holdout." The fifth and final reason — that he placed excessive emphasis on the Bible in his questionnaire — cannot be evaluated at all because the questionnaire has been lost, along with those of others whom the prosecutor might have passed.

questionnaire that he did not believe in the death penalty. Ana L., a seated white juror, made almost precisely the same statement in her questionnaire, writing that she "probably would not be able to vote for the death penalty." Also, Olanders D. later said during voir dire that he had reconsidered his views, and affirmed that he could be "personally responsible for being on a jury and actually voting for the death penalty." Once again, Ana L. said almost precisely the same thing: she stated that she had since rethought her position, and affirmed that she could "actually vote" for the death penalty.[19]

Second, in answer to the prosecution's purported concern that Olanders D.'s answers on voir dire were not always fully responsive, defense counsel could have questioned the validity of this assessment, suggested that his answers were in fact fully responsive, and pointed to seated white jurors whose answers were less responsive than Olanders D.'s. Our review of the voir dire transcript reveals nothing that supports the prosecution's claim: Olanders D.'s answers were responsive and complete. In order to make this fact clear to the trial judge, defense counsel could once again have compared Olanders D. to seated juror Ana L. Ana L. had, for example, responded "That is correct" to a question asking "why" she would prefer not to sit as a juror, stared blankly at defense counsel in response to a question on the presumption of innocence, and failed, at various points, to respond directly to yes or no questions.

Third, we cannot know exactly what arguments defense counsel could have made to undermine the prosecution's final reason for striking Olanders D. — that his questionnaire responses were "poor," and demonstrated his inability to express himself. Because Olanders D.'s questionnaire has

---

[19]Other seated white jurors to whom defense counsel could have pointed in order to show to be pretextual the prosecution's stated concern that Olanders D. would not be willing to impose the death penalty include Dorothy C., Dorothea L., Dorothy H. and Leona B. *See infra* Section V.B.2.

been lost, we may only speculate as to its contents. If the reason his answers were "poor" was that they were not particularly detailed, the defense could have compared his questionnaire to that of Ana L., whose answers were brief and often incomplete, or to that of Charles G., a seated white juror whose responses to the 77 questions were rarely longer than two or three words apiece. If the reason his answers were poor was that they reflected an inability to think clearly or express complex thoughts, the defense could have compared his questionnaire to that of Thomas B., a seated white juror who, for example, opined of street gangs, "I feel the only media coverage they get is bad, however, those whom do constructive events usually seek out positive media coverage." Further, this is an obvious instance in which the defense is prejudiced by being unable to compare Olanders D.'s answers to those of prospective white jurors who were accepted by the prosecution but struck by the defense, and whose questionnaires have been lost.[20] It is also, of course, possible that Olanders

---

[20]For example, Elizabeth S., who was in all likelihood white, was seated as an alternate on a panel accepted by the prosecution — which never used its sixth and final peremptory challenge in the selection of the alternate jurors — but was later struck by the defense. Her questionnaire, which was lost, might have been particularly valuable to Ayala for comparative juror analysis if her written responses were anything like those she delivered during voir dire. Consider the following exchange between the trial court and Elizabeth S.:

> Q: Did you have an opportunity to review the summary of legal issues and preliminary questions? This was a packet of material in the juror's lounge.
>
> A: No.
>
> Q: You didn't read it?
>
> A. Not today. I read the papers that they gave me in the office.
>
> Q. Today?
>
> A. Yeah.
>
> Q. Okay. That was the summary of legal issues and preliminary questions?
>
> A. Yeah, Yeah.

Perhaps because of this and similar exchanges, she was later asked if she had a hearing problem, which she did not.

D.'s answers were not poor at all. We have no way of knowing.

Thus, one of the four reasons given by the prosecution for striking this prospective juror was determined to be without merit by the trial judge; two failed to distinguish the juror whatsoever from at least one seated white juror; and the fourth and final reason the prosecution gave for striking the juror cannot be evaluated because his questionnaire was lost, as were those of the prospective white jurors struck by the defense. Given the objective reasons that we have even on this record to question the validity of the prosecution's explanations for striking Olanders D., we simply cannot conclude that it is likely that, if the defense had been present during the *Batson* proceedings and if the lost questionnaires had been preserved, Ayala would not have been able to show that the prosecution's stated reasons for striking Olanders D. were pretextual, and that the actual reasons were racial.

### 2. *Gerardo O.*

Gerardo O. was one of two Hispanic jurors the prosecution challenged during the second round of peremptories. He was struck, the prosecutor explained in the subsequent ex parte proceeding, because: (1) he was "illiterate," and had needed the questionnaire to be translated for him; (2) he "appeared not to fit in with anyone else," was "standoffish," with "dress and mannerisms . . . not in keeping with the other jurors," and "did not appear to be socializing or mixing with any of the other jurors"; and (3) his voir dire responses suggested that he was not sure "if he could take someone's life," and that he "felt a little shaky as far as his responsibilities in this case." The trial judge concluded that the "record document[ed] the factors that were indicated" by the prosecutor and accepted his explanation.

Once again, had the defense not been excluded from the *Batson* proceedings, it likely could have called into question

all of the prosecution's stated reasons for striking Gerardo O. Defense counsel could have first argued that one reason given — that Gerardo O. was illiterate — was itself indicative of the prosecution's discriminatory intent. Although Gerardo O. did need someone to fill out the questionnaire for him, the record reveals that he was not, in fact, illiterate, but simply had difficulty writing in English. Gerardo O. had been born in Mexico and was not a native English speaker, but he had graduated from high school and attended college in the United States, and was perfectly capable of reading the summary of legal issues that was given to prospective jurors before voir dire questioning. As he explained at voir dire, he did not fill out the questionnaire himself because he was concerned about his English spelling. The prosecution's purported reason for striking Gerardo O., then, was directly related to his status as someone who spoke Spanish as his first language. Thus, as the Supreme Court observed in a similar circumstance, "the prosecutor's frank admission that his ground for excusing th[is] juror[ ] related to [his] ability to speak and understand Spanish raised a plausible, though not a necessary, inference that language might be a pretext for what in fact [was a] race-based peremptory challenge[ ]." *Hernandez*, 500 U.S. at 363 (plurality opinion). Defense counsel's presence was necessary to point out the potential inferences to the trial judge and urge the judge to adopt the one most appropriate here.

An inference of racial bias might also have been drawn from the prosecutor's claim that Gerardo O. was challenged because he did not dress or act like other jurors, and did not mix or socialize with them. It is likely that Gerardo O.'s dress and mannerisms were distinctly Hispanic. Perhaps in the late 1980s Hispanic males in San Diego County were more likely than members of other racial or ethnic groups in the area to wear a particular style or color of shirt, and Gerardo O. was wearing such a shirt (and for this reason did not "fit in," in the prosecutor's mind, with the other jurors). If so, and if defense counsel were able to bring this fact to the trial court's attention, the prosecution's explanation that it struck Gerardo O.

because of his dress and mannerisms would provide compelling support for Ayala's claim that the strike was actually racially-motivated. *See id.* ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [classification] bears more heavily on one race than another.") (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). If present at the hearing, defense counsel could have made a record that would have strongly supported these claims.

Even if Gerardo O.'s clothes and behavior were in no way correlated with his race, defense counsel might have been able to show the prosecution's explanation to be pretextual. Defense counsel might have pointed to other jurors the prosecution had not struck who had similar characteristics — perhaps, for example, a seated white juror had actually worn an outfit identical to Gerardo O.'s. Defense counsel might also have been able to challenge the factual basis for the prosecution's claim — perhaps, unbeknownst to the trial judge, Gerardo O. did "socializ[e] or mix[ ]" with a number of other jurors, and had even organized a dinner for some of them at his favorite Mexican restaurant.

We can only speculate as to whether or how Ayala could have shown this explanation for striking Gerardo O. to be facially discriminatory, false or pretextual because we know nothing about his dress or mannerisms, or that of the other prospective jurors. These are exactly the sort of physical and behavioral observations that the defense could have preserved for the record had it been permitted to hear and respond to the prosecution's explanations for challenging Gerardo O. Although we might hope that the trial judge would have noticed if Gerard O. had been wearing a shirt worn only by members of the Hispanic community, or had been dressed identically to other prospective jurors whom the prosecution had not challenged, or had in fact been socializing with other jurors, "we cannot affirm simply because we are confident he

must have known what he was doing." *Thompson*, 827 F.2d at 1261.

Finally, in response to the prosecution's third reason for the strike — that Gerardo O. seemed reluctant to impose the death penalty — defense counsel could have demonstrated this reason to be pretextual through comparisons to jurors the prosecution did not strike. Gerardo O. had stated during voir dire that "I'm not sure if I can take someone's life in my hand and say . . . you know, 'death,' or something," but he soon thereafter affirmed that he "could vote for the death penalty." This statement was indistinguishable from those made by a number of seated white jurors. Dorothy C. said in voir dire that serving as a juror in a capital case would cause her to "worry a lot" because it was "a lot of responsibility," gasped when defense counsel told her that as a juror she would "decide the sentence," and stated, "I've never had to vote on a death penalty. That might be a little bit difficult when it came right down to it, but I'd say I'm for it." Likewise, Dorothy H., when asked in voir dire if she could return a verdict of death, stated, "I don't think it would be an easy thing for anyone, but I don't — I think I could do it if I felt it was the thing to do." Dorothea L. was even more hesitant, saying, when asked the same question, "I think so, but I don't know until I have to do it." Finally, Leona B., when asked by the prosecutor if having the responsibility for imposing the death penalty would "bother" her, responded, "Yes, I think so. I think — I think one should be affected . . . by that. I don't think it's anything to be taken lightly." Certainly, Gerardo O. expressed less hesitancy than Ana L., who had flatly stated on her questionnaire that she "probably would not be able to vote for the death penalty" before subsequently changing her mind. Further, prospective white jurors accepted by the prosecution but struck by the defense might have expressed similar sentiments in their jury questionnaires. We cannot tell, because these questionnaires have been lost.

Thus, one of the reasons given by the prosecution for striking this prospective juror could have itself given rise to an

inference of discriminatory intent. A second reason cannot be evaluated because defense counsel was excluded from the *Batson* proceedings and could not preserve for the record certain crucial facts. The third reason given failed to distinguish Gerardo O. from seated white jurors the prosecutor chose not to strike, as well as, possibly, from other prospective white jurors struck not by the prosecution but by the defense. Given the cause we have to question the validity of the prosecution's reasons that can be evaluated on this record, we cannot say that Ayala would not have shown that the trial court would or should have determined that the prosecution's strike of Gerardo O. violated *Batson*.

### 3.   *Robert M.*

The prosecution struck Hispanic juror Robert M. in the final round of peremptory challenges. In camera, the prosecutor explained that he had been concerned, given Robert M's response to voir dire questioning, that he might not be willing to impose the death penalty. This concern had been heightened by Robert M.'s mentioning the Sagon Penn case — a case in which the defendant was found not guilty in a second trial and the police and the district attorney's office were accused of misconduct. The trial judge accepted the prosecution's explanation, stating that, although Martinez's "questionnaire would tend to indicate a person that is certainly pro the death penalty[,] . . . his answers varied somewhat to the extent that individually, there may well be a legitimate concern as to whether or not he could impose it."

Defense counsel's presence in the *Batson* proceedings was necessary to call into question the prosecution's claim that it struck Robert M. because of his reluctance to impose the death penalty. Even without comparing Robert M. to other jurors permitted to serve, this explanation is highly suspect: Robert M. repeatedly stated during voir dire that he believed in the death penalty and could personally vote to impose it, and his questionnaire (which has, of course, been lost) mani-

fested a similar enthusiasm according to the trial judge. Defense counsel could have brought to the trial court's attention that the only statement potentially raising any question whatsoever — that voting for a death sentence might "weigh on his conscience," and would be a "heavy" decision — was indistinguishable from a practical standpoint from statements by Dorothy C, who said that serving as juror in a capital case was "a lot of responsibility" and would cause her to "worry a lot," Dorothy H., who stated that imposing the death penalty would not "be an easy thing for anyone," Dorothea L., who said she would not know if she could impose the death penalty until she had to do it, and Leona B., who affirmed that this responsibility would "bother" her. Other prospective jurors who were struck by the defense, but had been accepted by the prosecution, may have made comparable statements in their questionnaires (which, again, have been lost). Counsel could have argued that most jurors who believed in imposing the death penalty would consider a decision to do so a "heavy" decision that would weigh on one's conscience. Following counsel's argument, the judge might well have recognized that there is indeed rarely a "heavier" decision a citizen is ever asked to undertake. Certainly, like Gerardo O., Robert M. was no more hesitant than Ana L., who had actually at one point stated that she would be unable to impose the death penalty.

To the extent that the prosecution gave Robert M's reference to the Sagon Penn case as a separate reason for its challenge, defense counsel could likely have demonstrated that this reason was pretextual. First, the entirety of the Sagon Penn exchange was as follows:

> **Prosecutor:** Have you followed any kind of — any court cases in the news or come downtown to watch any trials?
>
> **Robert M.:** Well, I followed the Saigon [sic] Penn case.

**Prosecutor:** All right.

Robert M. briefly mentioned the case in response to the prosecution's question, and he said nothing about any accusations of police or prosecutorial misconduct.

Second, although none of the seated jurors had been asked a similar question, one seated white juror had on his own initiative referred to a far more controversial capital case. When asked to describe his feelings about the death penalty, Douglas S. mentioned the "Harris" case, saying: "The Harris case, which goes back . . . . I believe he's on death row . . . I can't even recall the exact crimes, but I remember them to be quite bizarre, and — and here he was, facing execution, and I don't know." Douglas S. was presumably referring to Robert Alton Harris, who at the time of Ayala's trial was on California's death row, and had, in a case that was extensively covered by the press, been tried, convicted and sentenced to death in San Diego. *People v. Harris*, 623 P.2d 240, 246 (Cal. 1981). As Harris's case wound its way through the state and federal courts, it generated substantial controversy, some of which, as in the Sagon Penn case, was related to allegations of official misconduct. *See, e.g.*, *id.* at 267 (Bird, C.J., dissenting) (arguing that Harris had been denied his right to a fair trial due to extensive and prejudicial pretrial publicity, partially the product of the "sorry spectacle of prosecutorial offices publicly vying with each other to have 'first crack' at convicting the accused"); *see also* Stephen R. Reinhardt, The Supreme Court, The Death Penalty, and The *Harris* Case, 102 Yale L.J. 205, 205 & n.1 (1992) (for further description of controversy generated by case). Douglas S.'s statement about the case — "here he was, facing execution, and I don't know" — suggests that this controversy had created some doubt in his mind as to the propriety of Harris's conviction and sentence. Certainly, Douglas S.'s unelicited discussion of the Harris case should have troubled the prosecutor far more than Robert M.'s brief direct response regarding the Sagon Penn case.

Finally, if there was any inference to draw from Robert M's fleeting reference to the Sagon Penn case, it was that Robert M. would not return a guilty verdict based on a blind trust of the police and the prosecution who had arrested and charged the defendant with the crime. Numerous seated white jurors expressed similar sentiments. Douglas S., for example, stated that the last person who had lied to his face was a California policeman. Similarly, Charles C. said, "You don't change your stripes . . . when you put on a badge; and you have to judge everybody's testimony in a court case on its face."

Even if the trial judge had not been willing to completely reject the prosecution's implausible explanation that it struck Robert M. because he mentioned the Sagon Penn case, there is a strong likelihood that, had defense counsel been present and been able to persuade the court that the prosecution's principal reason for challenging this juror — his reluctance to impose the death penalty — was pretextual, the court would have concluded that the strike violated *Batson.* We thus cannot conclude that the exclusion of defense counsel from the *Batson* proceedings did not prevent Ayala from showing that the prosecution's strike of Robert M. was based on its impermissible consideration of race.

* * *

Although each of the reasons offered by the prosecution for challenging the black and Hispanic jurors discussed above could have been shown to be pretextual had defense counsel been allowed to participate at steps two and three of the *Batson* proceedings and had the questionnaires of the vast majority of jurors been preserved, it is not necessary that all of the reasons advanced by the prosecution be pretextual or be shown to be pretextual. Notwithstanding the existence of some apparently appropriate reasons, "if a review of the record undermines . . . *many* of the proffered reasons, the reasons may be deemed a pretext for racial discrimination." *Kesser v. Cambra*, 465 F.3d 351, 360 (9th Cir. 2006) (en

banc) (quoting *Lewis v. Lewis*, 321 F.3d 824, 830 (9th Cir. 2003)) (emphasis added). In short, "[a] court need not find all nonracial reasons pretextual in order to find racial discrimination" with respect to any particular juror, and the exclusion of any one juror in violation of *Batson* requires reversal of the verdict. *Id.*

## C.

Because the defense was excluded from the *Batson* proceedings, it could not bring necessary facts and arguments to the attention of the trial judge, the institutional actor best positioned to evaluate the prosecution's credibility and to determine if its proffered reasons for striking the minority jurors were its actual and legitimate reasons. Because the defense was excluded from the *Batson* proceedings, *and* because the vast majority of the juror questionnaires were lost, the appellate courts reviewing this case cannot engage in a proper comparative juror analysis, or know what other facts and arguments might be employed to demonstrate that the proffered reasons were false, facially discriminatory and pretextual.

[15] Even on this deficient record, Ayala's *Batson* claim is compelling: the prosecution struck all seven of the black and Hispanic jurors in a position to serve on the jury, and many of its proffered race-neutral reasons are highly implausible. Given the strength of Ayala's prima facia case, the evidence that the prosecution's proffered reasons were false or discriminatory, the inferences that can be drawn from the available comparative juror analysis, and the deficiencies in the record that are themselves the product of the state's constitutional errors, it is "impossible to conclude that [Ayala's] substantial rights were not affected" by the exclusion of defense counsel from the *Batson* proceedings and the loss of the juror questionnaires. *Kotteakos*, 328 U.S. at 765. Ayala has suffered prejudice under *Brecht*, and is entitled to relief.

## VI.

Our dissenting colleague makes three assertions that are fundamental to her disagreement with our opinion. All are plainly erroneous and illustrate her misunderstanding of the nature of our holding. First, the dissent suggests that, because the trial court accepted the prosecutor's rationale for striking these jurors, deference to its ruling is required under AEDPA, citing *Rice v. Collins*, 546 U.S. 333, 338-39 (2006). Dissent at 10155-58. Along similar lines, the dissent accuses us of failing to give the state court decision the "benefit of the doubt," citing *Felkner v. Jackson*, ___ U.S. ___, 131 S. Ct. 1305, 1307 (2011). Dissent at 10164-65. Second, the dissent assumes that Ayala must demonstrate that the individual jurors were struck for racial reasons by "clear and convincing evidence," citing 28 U.S.C. § 2254(e)(1). Dissent at 10152. Third, the dissent makes the bizarre prediction that "[u]nder this approach all *Batson* challenges in federal habeas petitions must be granted because no one can disprove a negative." Dissent at 10135.

Each of these assertions assumes, incorrectly, that we are confronting an ordinary *Batson* challenge on habeas review — a challenge to the holding in a case in which defense counsel was able to present arguments to the trial court regarding racial bias, appeal that claim to the state appellate court, and subsequently seek reversal in federal court of the judgment that none of the jurors was struck by the prosecution for impermissible racially motivated reasons. *Rice* and *Felkner* are precisely such cases. The Supreme Court has emphasized, in such cases, that deference is required, that the petitioner must demonstrate his factual claims of prosecutorial bias by clear and convincing evidence, and that we may not give the petitioner the benefit-of-the-doubt with regard to the existence of racial prejudice. However, this case is not an ordinary *Batson* challenge, and for the reasons we have explained *supra* the dissent's approach is both inapplicable and wholly inappropriate. This, as the dissent consistently ignores, is a case

in which the challenge is to the procedure employed by the trial court in conducting the *Batson* inquiry — a procedure that resulted in the denial of a fair *Batson* hearing to the defendant.

We cannot defer to the trial court where procedural error (such as the state supreme court found here) has rendered the trial court's determination unreliable. Ayala's counsel was excluded from *Batson* stages two and three, thus depriving him of the opportunity to persuade the trial judge that the prosecutor was motivated by racial bias. Even a very capable trial judge may overlook or fail to understand the arguments supporting racial motivation "if unassisted by an advocate." *Thompson*, 827 F.2d at 1261. Because the procedures designed to ensure a fair hearing to the defendant were not followed, we cannot afford deference to the trial court's determination of the merits of the *Batson* claim. As we concluded in *Thompson*, we "cannot rely on . . . such fundamentally flawed procedures to show that that defendant suffered no prejudice." *Id.* at 1261.

Next, for similar reasons, the "clear and convincing evidence" standard has no role with regard to Ayala's challenge. The dissent's position is inherently at odds with the statutory authority on which it relies. That AEDPA provision reads as follows:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). We have previously held, in interpreting § 2254(e)(1), that "the presumption of correctness and the clear-and-convincing standard of proof *only* come into play

once the state court's fact-findings survive any intrinsic challenge." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004) (emphasis added) (cited by but expressly not overruled in *Wood v. Allen*, ___ U.S. ___, 130 S. Ct. 841, 848-49 & n.1 (2010)). In *Taylor*, we explained that a state court factual finding is intrinsically flawed if "the process employed by the state court is defective," *Id.* at 999 (citing *Nunes v. Mueller*, 350 F.3d 1045, 1055-56 (9th Cir. 2003)). Here, the state admitted that precluding Ayala's counsel from establishing a *Batson* violation at stages two and three of the state's trial court proceeding constituted procedural error. Under *Taylor*, because the state court proceeding is flawed, it is not entitled to a presumption of correctness, and Ayala is not required to demonstrate his *Batson* claim by clear and convincing evidence. The dissent's assertion is contrary to AEDPA and to *Taylor* and would simply erect an insurmountable barrier that would protect the conceded error against any effective federal review.

Finally, although the dissent accuses us of changing the approach in "all *Batson* challenges," this plainly misstates the nature of our holding. This is not a *Batson* challenge in the usual sense, but rather a procedural challenge to the exclusion of counsel from *Batson* stages two and three. Perhaps even more important, our dissenting colleague apparently fails to recall that error has been conceded by the state. The only issue here is prejudice — i.e., the effect of that error upon the petitioner's opportunity to show the prosecutor's bias. This could not be more different from the traditional *Batson* challenge, where prejudice is structural and proof of constitutional error requires reversal without any showing of prejudice. Thus, ordinary *Batson* cases are only about constitutional error and not at all about prejudice, whereas Ayala's case is all about prejudice and not at all about the conceded error. Accordingly, what we hold here could not possibly require that "all *Batson* challenges in federal habeas petitions must be

granted." To put it mildly, that contention is entirely without any rational basis whatsoever.[21]

## VII.

**[16]** We hold that the exclusion of defense counsel during *Batson* steps two and three constitutes prejudicial error. We cannot say that had counsel been permitted to participate in the *Batson* proceedings, and had the state not lost the vast majority of the jury questionnaires, Ayala would have been unable to show that the prosecution violated *Batson*. To the contrary, constitutional error on the part of the state likely prevented Ayala from showing that the prosecution utilized its peremptory challenges in a racially discriminatory manner, and thus permitted him to be tried, convicted, and sentenced to death by a jury selected in a manner repugnant to the Constitution. Accordingly, we reverse the judgment of the district court, and remand with instructions to grant the writ and order that Ayala be released from custody unless the state elects to retry him within a reasonable amount of time to be determined by the district court.

**REVERSED and REMANDED.**

---

[21]There is one additional error our dissenting colleague makes that is not limited to the *Batson* context but would rewrite the law of prejudice in all habeas cases. For that reason, it deserves mention here. As we have explained *supra*, the well-established *Brecht* standard governing prejudice has not been revised or modified, and the dissent's suggestion to the contrary is without merit. *See* discussion *supra* at Pages 10112-15 & n.15.

CALLAHAN, Circuit Judge, dissenting:

In 1985, Hector Juan Ayala shot and killed three men. In 1989, he was convicted on three counts of murder, and the jury returned a verdict of death. On direct appeal his conviction and sentence were affirmed by the California Supreme Court in 2000. *People v. Ayala*, 6 P.3d 193 (2000). The Supreme Court of the United States denied his petition for certiorari in 2001. *Ayala v. California*, 532 U.S. 908 (2001). Ayala filed his initial petition for a writ of habeas corpus in the United States District Court for the Southern District of California in 2002. This appeal is from the district court's February 17, 2009, final order denying the petition.

The majority holds, based primarily on law developed after Ayala's trial, that Ayala must be released or retried because it cannot tell whether the prosecutor in recusing seven jurors *might* have had a racial motive for doing so. It does so by extending each supporting argument just slightly beyond its limitations, in order to reach a conclusion that appears reasonable but nonetheless does not withstand scrutiny. The majority reaches its goal by ruling that Ayala's primary argument is not *Teague*-barred, creating an unreasonable standard for reviewing ancient alleged *Batson* violations, and refusing to give the California Supreme Court's findings the deference that several recent United States Supreme Court opinions require. In essence, the majority holds that because the record does not affirmatively negate the existence of a possible racial bias, the existence of such a bias may be assumed. Under this approach all *Batson* challenges in federal habeas petitions must be granted because no one can disprove a negative. The Supreme Court has clearly rejected such a standard and accordingly, I dissent.

**I**

In *Batson v. Kentucky*, 476 U.S. 79, 96 (1986), the Supreme Court held "a defendant may establish a prima facie case of

purposeful discrimination in selection of the petit jury solely
on evidence concerning the prosecutor's exercise of peremp-
tory challenges at the defendant's trial." *See also Georgia v.
McCollum*, 505 U.S. 42, 47 (1992). *Batson* established a
three-step inquiry. First, the defendant must make a prima
facie showing that the prosecution has exercised peremptory
challenges in a racially discriminatory manner. *Batson*, 476
U.S. at 96. The Supreme Court stated that it had "confidence
that trial judges, experienced in supervising *voir dire*, will be
able to decide if the circumstances concerning the prosecu-
tor's use of peremptory challenges creates a prima facie case
of discrimination against black jurors." *Id.* at 97. Second,
"[o]nce the defendant makes a prima facie showing, the bur-
den shifts to the State to come forward with a neutral explana-
tion for challenging black jurors." *Id.* Third, the trial court
must then "determine if the defendant has established pur-
poseful discrimination." *Id.* at 98.

In setting forth this three-step standard, the Supreme Court
specifically declined "to formulate particular procedures to be
followed upon a defendant's timely objection to a prosecu-
tor's challenges." *Id.* at 99. The Court reiterated that "[i]n
light of the variety of jury selection practices followed in our
state and federal trial courts, we make no attempt to instruct
these courts how best to implement our holding today." *Id.* at
99 n.24. As a result, during the quarter of a century that has
passed since *Batson*, courts have considered numerous ways
of applying *Batson*'s three-step standard.

Ayala's primary argument is that the exclusion of him and
his counsel from the proceedings in which the prosecution
justified its recusal of seven jurors violated his constitutional
rights to assistance of counsel at critical stages of the proceed-
ings, to be personally present, and to assist his counsel in his
defense. In response, the State argued and the district court
held that in 2001, when Ayala's conviction became final, the
exclusion of Ayala and his counsel from the proceedings had

not been established as a constitutional violation, and hence, was barred by *Teague v. Lane*, 489 U.S. 288 (1989).

The California Supreme Court in reviewing Ayala's direct appeal concluded that it was "almost universally recognized that ex parte proceedings following a motion regarding peremptory challenges allegedly made on the basis of improper group bias are poor procedure and should not be conducted unless compelling reasons justify them." *Ayala*, 6 P.3d at 203. However, in *Horn v. Banks*, 536 U.S. 266, 272 (2002), the Supreme Court held that "a federal court considering a habeas petition must conduct a threshold *Teagu*e analysis when the issue is properly raised by the state," even if the state supreme court did not consider the issue.

In *Caspari v. Bohlen*, 510 U.S. 383 (1994), the Supreme Court set forth the test for determining whether a claim was *Teague* barred:

> "[A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague v. Lane*, *supra*, 489 U.S. at 301. In determining whether a state prisoner is entitled to habeas relief, a federal court should apply *Teague* by proceeding in three steps. First, the court must ascertain the date on which the defendant's conviction and sentence became final for *Teague* purposes. Second, the court must "[s]urve[y] the legal landscape as it then existed," *Graham v. Collins, supra*, 506 U.S., at 468, and "determine whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution," *Saffle v. Parks*, 494 U.S. 484, 488 (1990). Finally, even if the court determines that the defendant seeks the benefit of a new rule, the court must decide whether that rule falls within one

> of the two narrow exceptions to the nonretroactivity
> principle. *See Gilmore v. Taylor*, 508 U.S. 333, 345
> (1993).

*Id.* at 390 (emphasis as quoted in *Caspari*, parallel cites
removed). There is no dispute that Ayala's conviction became
final in May 2001, when the Supreme Court denied certiorari,
and Ayala does not assert that he comes within either of the
two narrow exceptions. Thus, the question presented is
whether in May 2001, the unconstitutionality of ex parte pro-
cedure used by the trial court in 1986 was "dictated" by pre-
cedent.

The majority claims that in May 2001 this rule had been
"unequivocally 'dictated by precedent' " as a result of our
opinion in *United States v. Thompson*, 827 F.2d 1254 (9th
Cir. 1987). *Thompson*, however, did not announce a clear
constitutional rule, and furthermore, the majority confuses
what it sees as the wisdom of *Thompson* with the question of
whether that wisdom had been embraced by 2001.

*Thompson* concerned a 1985 criminal trial in a federal dis-
trict court. The judge alone conducted voir dire and "the gov-
ernment used four of its peremptory challenges to exclude all
four blacks in the venire." *Id.* at 1256. When "Thompson's
lawyer moved for a mistrial," the district court "allowed the
government to put its reasons for the disputed peremptory
challenges on the record, albeit in camera and out of the pres-
ence of the defendant and his lawyer." *Id.* Thompson
appealed arguing that this procedure violated his Fifth
Amendment right to due process and his Sixth Amendment
right to a fair and impartial jury. *Id.* We concluded that the
"district court erred in refusing to allow defense counsel in
this case to hear the government's reasons for excluding the
black potential jurors and to present argument thereon." *Id.* at
1261. We explained that "situations where the court acts with
the benefit of only one side's presentation are uneasy compro-
mises with some overriding necessity, such as the need to act

quickly or to keep sensitive information from the opposing party. Absent such compelling justification, ex parte proceedings are anathema in our system of justice and, in the context of a criminal trial, may amount to a denial of due process." *Id.* at 1258-59.

Although the logic behind the opinion in *Thompson* may be compelling, the opinion nonetheless does not dictate a constitutional standard. It concerned a federal court trial, not a state court trial.[1] It was not a unanimous opinion and the dissent argued that the majority's choice of an adversarial proceeding over an in camera proceeding was contrary to the Supreme Court's decision in *Batson* not to formulate particular procedures. *Id.* at 1262 (Sneed, J., dissenting). Moreover, although *Thompson* held that the district court in the case before it had erred as a matter of constitutional law, it did not set forth a binding rule. The opinion recognized that there were "occasional departures from" the norm of holding adversarial proceedings, noted a number of instances in which in camera proceedings were appropriate, and concluded that departure from the norm "*may* amount to a denial of due process." *Id.* at 1258-59 (emphasis added). The language in *Thompson* is clearly advisory when compared to our statement in *Menefield v. Borg*, 881 F.2d 696, 699 (9th Cir. 1989) that "we hold that the right to counsel attaches to the motion for a new trial stage."[2]

[1]*See Massachusetts Delivery Ass'n v. Coakley*, 671 F.3d 33, 48 (1st Cir. 2012)) (reiterating that "[s]tate courts are not bound by the dictates of the *lower* federal courts, although they are free to rely on the opinions of such courts when adjudicating federal claims") (internal citations omitted); *Bromley v. Crisp*, 561 F.2d 1351, 1354 (10th Cir. 1977) (noting that "the Oklahoma Courts may express their differing views on the retroactivity problem or similar federal questions until we are all guided by a binding decision of the Supreme Court"); *U.S. ex rel. Lawrence v. Woods*, 432 F.2d 1072, 1076 (7th Cir. 1970) (noting that "because federal courts exercise no appellate jurisdiction over state tribunals, decisions of lower federal courts are not conclusive on state courts").

[2]Contrary to the majority's suggestion, it was the absolute nature of our holding in *Menefield*, not the fact that the reasoning in *Menefield* was based on Supreme Court cases concerning constitutional rights, that commanded our adherence to *Menefield*'s holding in *Bell v. Hill*, 190 F.3d 1089, 1092-93 (9th Cir. 1999). *See* Majority at p. 10101.

The cautionary, rather than binding, nature of *Thompson* is confirmed by a review of other Ninth Circuit cases as well as decisions by our sister circuits. In *Lewis v. Lewis*, 321 F.3d 824, 831 n.27 (9th Cir. 2003), we observed that "[c]ertainly, requiring a court to allow defense counsel to argue [during the three-step *Batson* process] is not clearly established law." In *Majid v. Portuondo*, 428 F.3d 112 (2d Cir. 2005), the Second Circuit commented that "[i]t remains at least arguable that courts holding *Batson* hearings may, to the contrary, hear the explanations in camera and outside the presence of the defendants." *Id.* at 128 (citations omitted). In *United States v. Tucker*, 836 F.2d 334, 340 (7th Cir. 1988), the Seventh Circuit noted that the Supreme Court in *Batson* expressly declined to formulate procedures and disagreed with the Ninth Circuit's opinion in *Thompson* insofar as it required an "adversarial hearing once a defendant establishes a prima facie case of purposeful discrimination." Similarly, in *United States v. Davis*, 809 F.2d 1194, 1202 (6th Cir. 1987), the Sixth Circuit commented that *Batson* does not "require the participation of defense counsel while the Government's explanations are being proffered."

The majority strives mightily to distinguish these comments on the grounds that they are not well-reasoned, in some instances are merely dicta, and have been rejected by other circuits and most state courts. But the standard established by the Supreme Court for determining whether an issue is *Teague*-barred is not the merits of the old rule or even the recognition of the wisdom of the new rule, but whether the new rule was "dictated by precedent." *Caspari*, 510 U.S. at 390. These conflicting cases confirm *Thompson*'s advisory nature.

Furthermore, the rule that the majority claims was established is not a bright line rule. Rather, at most, *Thompson* states that defense counsel could not be excluded absent some "compelling justification." *See* Majority at p. 10106. Here, the prosecutor offered an explanation for seeking to present his reasons in camera; he did not want to reveal his strategy to the

defense. Following *Thompson* and the other cases cited by the majority, it is now clear that this is not a valid reason not to follow the norm of an adversarial proceeding.[3] However, this was not dictated in 2001 when Ayala's conviction became final.

In sum, I agree with the district court that the right to be present and have counsel present when the prosecution presented its reasons for its challenged recusals was not "dictated by precedent" when Ayala's conviction was final, and therefore that the issue is *Teague*-barred.

## II

Assuming that the issue is not *Teague*-barred, I agree with the majority (and the California Supreme Court) that the exclusion of the defense from the *Batson* proceedings was error, and that it was not structural error. *See* Majority at pp. 10109-10. However, we again part company when determining the appropriate standard of review. The majority reads our recent cases to allow it to pose the question as "[if] we cannot say that the exclusion of defense counsel and the loss of the questionnaires likely did not prevent Ayala from prevailing on his *Batson* claim, then we must grant the writ." *See* Majority at p. 10115. However, pursuant to controlling Supreme Court opinions, we can grant relief only if, at a minimum, the California Supreme Court's harmlessness determination was objectively unreasonable.

In *Brecht v. Abrahamson*, 507 U.S. 619, 633-37 (1993), the Supreme Court explained that collateral review is different from direct review. It held:

---

[3]The California Supreme Court carefully considered the prosecutor's claim that his reasons would disclose matters of strategy. It concluded that the prosecutor had "simply [given] the reasons for his challenges, reasons that defendant was entitled to hear and that disclosed no secrets of trial strategy." *Ayala*, 6 P.3d at 202-03. Accordingly, it concluded that "[i]t was unreasonable to exclude defendant from the hearings." *Id.* at 203.

> The imbalance of the costs and benefits of applying the *Chapman* harmless-error standard on collateral review counsels in favor of applying a less onerous standard on habeas review of constitutional error. The *Kotteakos* standard, we believe, fills the bill. The test under *Kotteakos* is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." 328 U.S. at 776. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice." *See United States v. Lane*, 474 U.S. 438, 449 (1986).

*Id*. at 637 (parallel citations omitted).

Three years after the Supreme Court decided *Brecht*, "Congress passed, and the President signed, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), under which a habeas petition may not be granted unless the state court's adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .' 28 U.S.C. § 2254(d)(1)." *Fry v. Pliler*, 551 U.S. 112, 119 (2007).

Fry challenged his murder conviction on the grounds that the state trial court exclusion of a person's testimony deprived him of constitutional due process. *Id*. at 115. The state appellate court found that the trial court had not abused its discretion in excluding the testimony and noted in passing that there was no possible prejudice. *Id*. Fry filed a habeas petition in a federal district court. *Id*. The district court determined that the exclusion of the testimony had been "an unreasonable application of clearly established law," and disagreed with the state appellate court's determination that there was "no possible prejudice," but nonetheless concluded that "there ha[d] been

an insufficient showing that the improper exclusion of the testimony of Ms. Maples had a substantial and injurious effect on the jury's verdict under the standard set forth in *Brecht*." *Id*. at 115-16 (internal quotation marks omitted). The Ninth Circuit affirmed, and the Supreme Court in turn affirmed the Ninth Circuit. *Id*. at 116, 122.

In its opinion in *Fry*, the Supreme Court reconciled the *Brecht* standard with AEDPA. The Court explained:

> In *Mitchell v. Esparza*, 540 U.S. 12 (2003) (*per curiam*), we held that, when a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable. Petitioner contends that § 2254(d)(1), as interpreted in *Esparza*, eliminates the requirement that a petitioner also satisfy *Brecht*'s standard. We think not. That conclusion is not suggested by *Esparza*, which had no reason to decide the point. Nor is it suggested by the text of AEDPA, which sets forth a precondition to the grant of habeas relief ("a writ of habeas corpus . . . shall not be granted" unless the conditions of § 2254(d) are met), not an entitlement to it. Given our frequent recognition that AEDPA limited rather than expanded the availability of habeas relief, *see, e.g., Williams v. Taylor*, 529 U.S. 362, 412 (2000), it is implausible that, without saying so, AEDPA replaced the *Brecht* standard of " 'actual prejudice,' " 507 U.S. at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)), with the more liberal AEDPA/*Chapman* standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable. That said, it certainly makes no sense to require formal application of *both* tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former. Accordingly, the Ninth

Circuit was correct to apply the *Brecht* standard of
review in assessing the prejudicial impact of federal
constitutional error in a state-court criminal trial.

*Fry*, 551 U.S. 119-120 (emphasis in original, parallel citations
omitted).

Three aspects of the Supreme Court's explanation are par-
ticularly important. First, the Court endorsed its opinion in
*Esparza*, 540 U.S. 12, that habeas relief was available only if
the state court's determination of harmlessness was unreason-
able. Second, the Court reiterated that AEDPA "limited rather
than expanded the availability of habeas relief." *Fry*, 551 U.S.
at 119. Third, the Court held that the *Brecht* "actual preju-
dice" standard requires a greater showing than the "the more
liberal AEDPA/*Chapman* standard which requires only that
the state court's harmless-beyond-a-reasonable-doubt deter-
mination be unreasonable." *Id.* at 119-20. These concerns led
the Court to hold that:

> in § 2254 proceedings a court must assess the preju-
> dicial impact of constitutional error in a state-court
> criminal trial under the "substantial and injurious
> effect" standard set forth in *Brecht*, *supra*, whether
> or not the state appellate court recognized the error
> and reviewed it for harmlessness under the "harm-
> less beyond a reasonable doubt" standard set forth in
> *Chapman*, 386 U.S. 18.

551 U.S. at 121-22 (parallel citations omitted).

Despite the relatively clear language in *Fry*, the majority,
citing our decisions in *Pulido v. Chrones*, 629 F.3d 1007 (9th
Cir. 2010), and *Merolillo v. Yates*, 663 F.3d 444 (9th Cir.
2011), revises the *Brecht* standard to require relief where the
record is evenly balanced and a judge has "grave doubt about
whether an error affected the jury." *See* Majority at pp.

10113-14. How the majority reaches this conclusion is somewhat of a mystery.[4]

Our opinion in *Pulido* does not support the majority's approach. The majority cites a single clause out of context: we "apply the *Brecht* test without regard for the state court's harmlessness determination." Majority at p. 10113 (quoting *Pulido*, 629 F.3d at 1012). However, this clause comes at the end of a paragraph that explains:

> In *Fry v. Pliler*, 551 U.S. 112 (2007), the Supreme Court clarified that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") did not replace the traditional test for prejudice on collateral review — i.e., whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623. Moreover, *Fry* explained that we need not conduct an analysis under AEDPA of whether the state court's harmlessness determination on direct review — which is governed by the "harmless beyond a reasonable doubt" test set forth in *Chapman v. California*, 386 U.S. 18, 24 (1967) — was contrary to or an unreasonable application of clearly established federal law. *Fry*, 551 U.S. at 119-20 (citing 28 U.S.C. § 2254(d)(1)). This is because the *Brecht* test "obviously subsumes" the

---

[4]In contrast to the standard set forth in the body of its opinion, the majority in footnote 11 recognizes that "[i]n holding that Ayala has demonstrated his entitlement to relief under *Brecht*, we therefore also hold to be an unreasonable application of *Chapman* the California Supreme Court's conclusion that Ayala was not prejudiced by the exclusion of the defense during *Batson* steps two and three or by the loss of the questionnaires." I agree with this approach but not its conclusion. In order to reach the conclusion that the California Supreme Court's determination that the constitutional violation was harmless, we must follow the Supreme Court's opinion in *Esparza*, as cited in *Fry*, 551 U.S. at 119, and determine that "*the harmlessness determination itself* was unreasonable." (emphasis in original). Here, the California Supreme Court's determination of harmlessness was not objectively unreasonable.

"more liberal AEDPA/*Chapman* standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable." *Id*. at 120. Accordingly, we apply the *Brecht* test without regard for the state court's harmlessness determination.FN3 *See id*. at 121-22.

FN3. It follows that we apply *Brecht* "whether or not the state appellate court recognized the error and reviewed it for harmlessness" under *Chapman. Fry*, 551 U.S. at 121-22.

629 F.3d at 1012 and n.3 (parallel citations omitted). Thus, *Pulido* does not suggest that we may disregard the California Supreme Court's determination that the constitutional violation was harmless.

*Merolillo* is arguably more ambiguous. The opinion first recognizes that we look to the last reasoned decision of the state court and that the state court's findings "are entitled to a presumption of correctness unless the petitioner rebuts the presumption with clear and convincing evidence." 663 F.3d at 453 (citing 28 U.S.C. § 2254(e)(1)). The opinion quotes from the Supreme Court's discussion of harmless error in two opinions, *Kotteakos v. United States*, 328 U.S. 750, 765 (1946), and *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). In *O'Neal*, decided after *Brecht*, the Supreme Court held "that in cases of grave doubt as to harmlessness the petitioner must win." 513 U.S. at 437. It concluded that "when a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." *Id*. at 445.

*Merolillo* goes on to cite *Fry* and *Pulido*, and in light of these cases held that:

the *Brecht* "substantial and injurious effect" standard governs our harmless error review in this case. For the reasons discussed below, we conclude that under

the *Brecht* standard, Merolillo is entitled to habeas relief. We further conclude that even if Merolillo were also required to satisfy the AEDPA/*Chapman* standard, he would, as the state court's determination that the error was harmless beyond a reasonable doubt was an objectively unreasonable application of *Chapman*.

663 F.3d at 455.

The arguable tension between the "grave doubt as to the harmlessness of an error" and AEDPA was relieved by the Supreme Court in *Harrington v. Richter*, 131 S. Ct. 770 (2011). There, the Court reiterated that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 654 . . . (2004)." *Id.* at 786. Justice Kennedy, writing for the Court, explained:

> The Court of Appeals appears to have treated the unreasonableness question as a test of its confidence in the result it would reach under *de novo* review: Because the Court of Appeals had little doubt that Richter's *Strickland* claim had merit, the Court of Appeals concluded the state court must have been unreasonable in rejecting it. This analysis overlooks arguments that would otherwise justify the state court's result and ignores further limitations of § 2254(d), including its requirement that the state court's decision be evaluated according to the precedents of this Court. *See Renico v. Lett*, 559 U.S. ___ (2010). It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *See Lockyer* [*v. Andrade*], [538 U.S. 63] at 75 [(2003)].

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d)

stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

131 S. Ct. 786-87 (parallel citations omitted).

In reiterating that a writ may issue only where there is no possibility that fairminded jurists could agree with the state court's decision, the Supreme Court refined the "grave doubt" standard set forth in *Brecht*. A federal court cannot have "grave doubt" as to harmlessness if a fairminded jurist could agree on the correctness of the state court's decision. *See Harrington*, 131 S. Ct. at 786. The Court explained that "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.*

Accordingly, pursuant to Supreme Court precedent, a writ may not issue just because "we cannot say that the exclusion of defense counsel and the loss of questionnaires likely did not prevent Ayala from prevailing on his *Batson* claim." Majority at p. 10115. Rather, a writ may issue only if we determine that no fairminded jurist could find that the exclusion of defense counsel and the loss of questionnaires did not prevent Ayala from prevailing on his *Batson* claim. This is the essence of the Supreme Court's holdings and we should accept it as such. *See, e.g., Harrington*, 131 S. Ct. at 786-87 ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

## III

The application of the fairminded jurist standard requires deference to the California Supreme Court's opinion.

### A. *The Loss of Certain Prospective Jurors' Questionnaires.*

The majority stresses the "loss of an overwhelming majority of the jury questionnaires" in concluding that this "increased the prejudice that Ayala suffered as a result of the exclusion of defense counsel." Majority at pp. 10107, 10109. However, Ayala has not shown either that the loss of certain prospective jurors' questionnaires violated his constitutional rights or that the loss prejudiced him.

First, it is critical to note what was in the record before the California Supreme Court. The record contained the voir dire of all prospective jurors, the transcript of the in camera hearings on the prosecutor's reasons for the recusals, the questionnaires of all the seated jurors, and the questionnaires of the

alternate jurors. What was missing were the 77-question, 17-page questionnaires that the 200 or so other potential jurors had filled out.

In *Boyd v. Newland*, 467 F.3d 1139 (9th Cir. 2006), we recognized that the Supreme Court's opinion in *Miller-El v. Dretke*, 545 U.S. 231 (2005), holds that "comparative juror analysis is an important tool that courts should utilize in assessing *Batson* claims."[5] *Boyd*, 467 F.3d at 1145. We commented that "comparative juror analysis" referred "to an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group." *Id*. *Boyd* concluded:

> A reviewing court cannot examine the "totality of the relevant facts" and "all relevant circumstances," *Batson*, 476 U.S. at 94, surrounding a prosecutor's peremptory strike of a minority potential juror without an entire voir dire transcript. A transcript of the complete voir dire, as distinct from a partial transcript up to the time of the *Batson* motion, is proper because comparative juror analysis is appropriate both at the time of the *Batson* motion and in light of all subsequent voir dire testimony.

467 F.3d at 1151 (internal citation and parallel citations omitted). Here, we have the entire voir dire transcript. Moreover, there is nothing in *Boyd* to suggest that in addition to voir dire, juror questionnaires from jurors who are not selected are critical to a determination of the totality of the relevant facts.

Indeed, the opposite conclusion can be drawn from the

---

[5]We further held that the right to a comparative juror analysis explicitly set forth in *Miller-El* was not *Teague*-barred as it "simply illustrates the means by which a petitioner can establish, and should be allowed to establish, a *Batson* error." *Boyd*, 467 F.3d at 1146 (internal citation omitted).

panel's treatment of a state rule requiring an indigent defendant to show some cause in order to receive a free transcript of voir dire. We held, citing *United States v. MacCollum*, 426 U.S. 317, 322-23 (1976), that the local rule did not violate the constitution, but that the state court erred in failing to recognize that the defendant had raised a plausible *Batson* claim entitling him to a transcript of voir dire. *Boyd*, 467 F.3d at 1151. If a defendant can be required to show some cause in order to receive a transcript of voir dire, it follows that a defendant has no *per se* right to the preservation of all questionnaires filled out by prospective jurors who were not seated.

To be fair, there is language in our en banc opinion in *Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006) (en banc), that might be read to infer a right to juror questionnaires. We concluded that: "In this case, an evaluation of the voir dire transcript and juror questionnaires clearly and convincingly refutes each of the prosecutor's nonracial grounds, compelling the conclusion that his actual and only reason for striking Rindels was her race." *Id.* at 360. It appears that in *Kesser,* the juror questionnaires were available and thus we could consider them, but we did not indicate that they were necessary. Instead, we commented that a comparative juror analysis was appropriate because "[w]e too have a transcript of voir dire and a *Batson* claim fairly presented, and that is all *Miller-El* requires." *Id.* at 361.

Recently, in *Briggs v. Grounds*, 682 F.3d 1165 (9th Cir., 2012), we considered *Batson* challenges to a state court conviction where the federal record did not contain the questionnaires of excused jurors. *Id.* at 1170. In affirming the district court's denial of relief, the majority noted:

> The dissent seems to conclude that because we cannot independently verify the answers from the questionnaires as they are not in the record, the defense's characterization is equally, if not more, plausible

> despite the state court determinations to the contrary. However, "AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt," *Jackson v. Felkner*, [*sic*] ___ U.S. ___, ___, 131 S. Ct. 1305, 1307 (2011) (per curiam) (internal quotation marks omitted) (overturning the Ninth Circuit). The dissent's readiness to doubt the state court determination based on the defendant's characterization of the record does not apply the appropriate level of deference Congress and the United States Supreme Court have required of us.

*Id.* at 1170-71 (parallel citation omitted). The majority further noted that "it is widely acknowledged that the trial judge is in the best position to evaluate the credibility of the prosecutor's proffered justifications." *Id*. at 1171 (internal citations omitted). Citing the Supreme Court's statements in *Rice v. Collins*, 546 U.S. 333, 338-39 (2006), that a "federal habeas court can only grant Collins' petition if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge," the majority stated:

> it would be anathema to AEDPA if we were to assume that the petitioner's contentions about the questionnaires are true simply because the record before us does not contain the excused jurors' questionnaires. The burden to disprove the factual findings rests with Briggs. 28 U.S.C. § 2254(e)(1) (requiring "clear and convincing evidence" to rebut "a determination of a factual issue made by a State court").

*Id*. Thus, under controlling Supreme Court and Ninth Circuit case law, the lack of prospective jurors' questionnaires does not relieve Ayala of his burden to show by clear and convincing evidence that the California Supreme Court was wrong in determining that the prosecutor was not biased.

In the absence of any authority holding that the lost jurors' questionnaires inherently deprives a reviewing court of a sufficient record to evaluate a *Batson* claim, the issue becomes whether Ayala has shown that the lack of the questionnaires in his case renders the record insufficient. He fails in this task for several reasons.

First, the California Supreme Court reasonably rejected Ayala's claim that his constitutional rights were infringed by the loss of the bulk of prospective juror questionnaires. It explained:

> The deficiency of which he complains is the absence of certain questionnaires, which were completed by prospective jurors, then lodged with the superior court, subsequently lost by its clerk's office, and finally determined by the superior court to be beyond reconstruction. A criminal defendant is indeed entitled to a record on appeal that is adequate to permit meaningful review. That is true under California law. [Citation.] It is true as well under the United States Constitution — under the Fourteenth Amendment generally, and under the Eighth Amendment specifically when a sentence of death is involved. [Citation.] The record on appeal is inadequate, however, only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal." ( [*People v. Alvarez*, 14 Cal. 4th 155] at p. 196 fn. 8 [1996]).

*Ayala*, 6 P.3d at 208. The California Supreme Court concluded that if the loss of the questionnaires was error under either federal or state law, "it was harmless beyond a reasonable doubt." *Id.* This determination is entitled to deference. *Rice*, 546 U.S. at 338-39.

Second, the importance of the missing juror questionnaires is questionable. The questionnaires of the 70 or so jurors who

were never called have little relevance. The questionnaires of those jurors who were called and then excused would be relevant only if there was some showing that the jurors were excused due to constitutionally forbidden reasons. However, Ayala has not offered any specific allegations concerning the missing questionnaires.

Third, none of the prosecutor's stated reasons for recusing the questioned jurors relied solely on the jurors' questionnaires. Rather, in each instance the prosecutor mentioned the juror's specific answers to questions posed on voir dire. In a couple of instances the prosecutor referenced a person's questionnaire, but this was primarily to explain why he found the individual's oral responses troubling.

Finally, Ayala has been able to present his specific *Batson* challenges based on the voir dire transcript and the extant questionnaires of the seated jurors and alternates. Although Ayala argues that the lost questionnaires might support his arguments, such a contention can be made about any lost document. If such speculation constituted prejudice the standard would be reduced to a *per se* rule.

B.  *Challenges to the Individual Jurors.*

It follows that the next question is whether Ayala has shown by clear and convincing evidence that no reasonable jurist could have credited the prosecutor's non-discriminatory reasons for excusing the seven jurors in issue. The majority only discusses three of the jurors in its opinion, but a review of the prosecutor's reasons for excusing each of the seven jurors shows that the California Supreme Court's determination that "the challenged jurors were excluded for proper, race-neutral reasons," was reasonable. *See Ayala*, 6 P.3d at 204.

1.  *Olanders D.*

Olanders D.'s recusal was one of the first challenged by Ayala. The trial court held that Ayala had not met the first

prong of the *Batson* test (a prima facie showing that the challenge was based on race, *see Kesser*, 465 F.3d at 359), but nonetheless indicated that it would hear the prosecutor's reasons for the recusal in order to have a complete record. The prosecutor stated in the ex parte proceeding:

> My primary concern with regard to [Olanders D.] is his ability to vote for the death [sentence] during the penalty phrase. On his questionnaire he indicated that he does not believe in the death penalty. He did indicate that his view had changed over the last several years. He told us that he did want to serve. During the time that he was questioned, I felt that his responses were not totally responsive to the questions of either counsel for the defense or myself.
>
> My observations in reading his questionnaire and before even making note of his racial orientation was that his responses on the questionnaire were poor. They were not thought out. He demonstrated a lack of ability to express himself well. And his answers did not make a lot of sense. As a result, I felt that he is not a person who could actively participate in a meaningful way in deliberations with other jurors, and his ability to fit in with a cohesive group of 12 people I sincerely question, and it was for that reason plus his stand on the death penalty that led me to believe that I did not want him on this jury.

The trial judge responded:

> Okay. Certainly with reference to whether or not he would get along with 12 people, it may well be that he would get along very well with 12 people. I think the other observations of counsel are accurate and borne out by the record.

The California Supreme Court held that the record showed that the challenged jurors were excluded for proper, race-

neutral causes. *Ayala*, 6 P.3d at 204. Addressing Olanders D., the court commented:

> [T]he prosecutor stated he had exercised the challenge in part because his questionnaire indicated he opposed the death penalty. The prosecutor acknowledged Olanders D.'s oral statements that his views had changed, but commented that his answers were "not totally responsive to the questions of either counsel for the defense or myself." He further stated, in essence, that Olanders D.'s difficulties in communicating led him to question whether he would "fit in" on the jury. The court disagreed with the latter point, noting, "it may well be that he would get along very well with 12 people," but added: "I think the other observations of counsel are accurate and borne out by the record."

6 P.3d at 204. The California Supreme Court further noted that the trial court "credited the prosecutor's opinion[ ] that Olanders D. opposed the death penalty." 6 P.3d at 206.

The majority claims that the prosecutor's motives for excusing Olanders D. is suspect for several reasons. First, Ayala "could have pointed to seated white jurors" who similarly expressed hesitancy to impose the death penalty. Second, the majority asserts that its review of the voir dire transcript shows that "Olanders D.'s answers were responsive and complete." It further asserts that the responses of a seated white juror, Ana L., were just as unresponsive. Third, the majority argues that because Olanders D.'s questionnaire was lost, they "cannot know exactly what arguments defense counsel could have made to undermine" the prosecutor's claim that Olanders D.'s questionnaire responses were poor. *See* Majority at p. 10156. The majority concludes that none of the reasons proffered by the prosecutor should be sustained because one was rejected by the trial judge, "two failed to distinguish the juror whatsoever from at least one seated white juror," and

the fourth cannot be evaluated because his questionnaire was lost. Majority at pp. 10156-57.

Were we reviewing the trial judge's decision de novo, the majority's approach might be persuasive. But the applicable standard is whether no fairminded judge could agree with the California Supreme Court's determination that the juror was excluded for proper, race-neutral reasons. *See Harrington*, 131 S. Ct. at 786. Ayala does not come close to meeting this standard.

There is no suggestion that any seated juror raised a similar set of concerns as Olanders D. The trial judge, who had the opportunity to observe Olanders D., agreed with the prosecutor that Olanders D. was ambivalent about the death penalty, had not been responsive on his questionnaire, and lacked the ability to express himself clearly. Moreover, the trial judge did not necessarily reject the prosecutor's concern that Olanders D. could not participate in a meaningful way in jury deliberations, but rather only commented that he "may well be that he would get along very well with 12 people [on the jury]." The trial court's determinations as affirmed by the California Supreme Court are presumed correct. *Rice*, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' § 2254(e)(1).").

The majority's expressed concerns about Olanders D.'s recusal are far from compelling. It is hardly surprising that a number of potential jurors expressed ambivalence about the death penalty. The fact that a prosecutor is more concerned with one potential juror's ambivalence than another is not necessarily a sign of racial prejudice. Similarly, the fact that the majority in reviewing the voir dire transcripts thinks that a seated juror's responses were no more responsive than Olanders D.'s is really of little moment. As noted, the trial judge — who heard Olanders D.'s voir dire — agreed with

the prosecutor that he "demonstrated a lack of ability to express himself well." The majority's supposition that Olanders D.'s questionnaire responses may not have been "poor" is not clear or convincing evidence of anything. At most, the majority's arguments and assumptions may suggest that the prosecutor's evaluation of Olanders D. was not compelled, but none of them really question the sincerity of the prosecutor's reasons or suggest a likelihood of some unstated improper motive.[6] The majority fails to show that a fairminded jurist could not have agreed with the California Supreme Court.

### 2.   *Gerardo O.*

Gerardo O. was one of the recusals that Ayala challenged in his second objection. The prosecutor explained his challenge to Gerardo O. as follows:

---

[6]The only indicia of possible racial bias was the fact that seven of the eighteen peremptory challenges exercised by the prosecutor excused African-American and Hispanic jurors. If this were enough to compel a finding of racial bias, there would be no reason for the second and third steps in the *Batson* standard or for deference to the trial court's determinations. The lack of any compelling evidence of racial bias is clear when the record in this case is compared to the prosecutor's statements in *Kesser*, 465 F.3d 351. There, in overcoming the deference due to the state court's determinations, we commented:

> The racial animus behind the prosecutor's strike is clear. When he was asked to explain why he used a peremptory challenge to eliminate Rindels, he answered using blatant racial and cultural stereotypes.

*Id.* at 357. Here, in contrast, all the majority can do is suggest that other jurors, like Olanders D., were uncomfortable with the death penalty, failed to offer thoughtful answers, and did not communicate well. But even if the prosecutor's perceptions about Olanders D. were incorrect or not unique, that fact would not be such compelling evidence of pretext as to justify a failure to defer to the California Supreme Court's reasoned determination that the jurors were excused for proper, race-neutral reasons. *Ayala*, 6 P.3d at 204.

I made an observation of [Gerardo] when he first entered the courtroom on the first day that the jurors were called into the area.

At that time, he appeared to not fit in with anyone else. He was a standoffish type of individual. His dress and his mannerisms I felt were not in keeping with the other jurors.

He indicated to us at the beginning that he was illiterate. Actually, his words were that he was illiterate, and that he therefore had the questionnaire translated to him, so that he could make responses.

I observed him on subsequent occasions when he came to the court, and observed that he did not appear to be socializing or mixing with any of the other jurors, and I also take into account his responses on the questionnaire and in the *Hovey* questioning process, at which time he expressed that he had no feeling with regard to the death penalty in writing.

When being questioned, he said that he was not sure if he could take someone's life, or if he could take someone's life into his hands.

He further responded in the *Hovey* process that there would be eleven other people, that he felt a little shaky as far as his responsibilities in this case.

For those reasons, I felt that he would be an inappropriate juror, and for that reason, I exercised the peremptory challenge.

The trial court accepted the prosecutor's reasons. It noted that the record supported the prosecutor's observations and commented that the recusal was based on Gerardo O.'s indi-

vidual traits. The California Supreme Court in rejecting Ayala's *Wheeler/Batson* claim noted that "Gerardo O. struggled with English and did not understand the proceedings." *Ayala*, 6 P.3d at 206.

The majority does not deny that Gerardo O. stated that he was illiterate, or that he needed someone to fill out his questionnaire, or that he dressed differently, or that he did not mix with the other jurors. *See* Majority at pp. 10122-24. Instead, the majority speculates that Ayala's lawyer might have shown that (1) despite his own comments, Gerardo O. was not illiterate, or that (2) Geraldo O.'s "dress and mannerisms were distinctly Hispanic."[7] Majority at p. 10123. It further muses that the prosecutor's comments concerning Gerardo O.'s manner and aloofness and his ambivalence toward the death penalty could have been pretexts for an underlying racial bias.[8] Major-

---

[7]The majority's cited quote from *Hernandez v. New York*, 500 U.S. 352 (1991), demonstrates that *Hernandez* is not applicable to this case. The Supreme Court noted "the prosecutor's frank admission that his ground for excusing these jurors related to their ability to speak and understand Spanish raised a plausible, though not a necessary, inference that language might be a pretext for what in fact were race-based peremptory challenges." *Id.* at 363. Here, the prosecutor did not mention any concern with Gerardo O.'s ability to speak Spanish and there does not appear to be any indication that any juror's ability to speak Spanish was an issue. Instead, the majority having poured over the record to determine that Gerardo O., despite his own admission of illiteracy, had "attended college in the United States," opines that he "was perfectly capable of reading the summary of legal issues that was given to prospective jurors." Majority at p. 10123. It then leaps to the unsupported conclusion that the "prosecutor's purported reason for striking Gerardo O., then, was directly related to his status as someone who spoke Spanish as his first language." Majority at p. 10123. The majority's speculation may not be illogical, but it is far from compelling.

[8]The majority also suggests that Gerardo O.'s ambivalence to the death penalty was no more pronounced than some seated white jurors. Majority at pp. 10125. As previously noted, the potential jurors' attitudes toward the death penalty was an important consideration for both the defense and the prosecution. The fact that the prosecutor distinguished between levels of ambivalence that the majority over twenty years later argues are indistinguishable is hardly a sign of pretext. Moreover, there is no doubt that Gerardo O.'s qualifications — professed illiteracy, distinctive dress and aloofness, and ambivalence to the death penalty — were unique.

ity at p. 10123-24. Of course, it is impossible to negate such possibilities, but there is nothing but the majority's imagination to fuel its assertions. Here, the trial judge agreed with the prosecutor's observations of Gerardo O. and the California Supreme Court affirmed. The majority has not presented the type of clear evidence that the United States Supreme Court has held is necessary to overcome our deference to state court findings. *See Rice*, 546 U.S. at 338-39.

### 3. *Robert M.*

Robert M. was one of the last persons whose recusal was challenged. The prosecutor explained his reasons as follows:

> As far as [Robert M.] is concerned, Miss Michaels and I had discussions during the selection process here in court, even as late as immediately before the exercise of the last challenge.
>
> The court would note that I had passed at one point, leaving [Robert M.] on.
>
> I have always felt some degree of reluctance with regard to [Robert M.], and my concern primarily is in the area of whether, after conviction, [Robert M.] would actually vote for the death penalty, and it was my view that taking all of his responses in *Hovey* into account, and the — some of his responses even as late as yesterday — for example, the following of the Sagon Penn case. It was Miss Michaels doing the questioning at that time, and I did not actually — it would have been possibly a disadvantage or a disservice to inquire further as to his impressions about the Sagon Penn case.
>
> I'm concerned about that case because the fact that Mr. Penn, in a very notorious trial here, was found not guilty in a second trial, and allegations of mis-

conduct with regard to the District Attorney's office and the police were certainly rampant in that case.

There's really no way for me to inquire as to where [Robert M.] actually stood.

As far as [Robert M.] is concerned, our scores, a combination of all the factors — Mr. Cameron graded [Robert M.] as a four, Miss Michaels had rated [Robert M.] as a five, and my score on him was four to a five, somewhere in that area.

I had before doing any of the selection process, resolved that at the very best, we would not wish to have any jurors on this case whose combined score was five or less.

In spite of that, I passed once on him, but it is my view, basically, that because of his attitudes with regard to the death penalty, such as in his first response to whether he would always vote for — well, in the question number one about whether he would always vote for guilt, he indicated that it was a difficult question.

He said that he believed in the death penalty, but it was hard for him to be involved in the death penalty.

With regard to questions about whether he would vote for death, he said no, it would be hard to say, no, I don't know what the evidence is, and Miss Michael's reasons, which she expressed to me, and I have to agree with, is a great degree of concern about whether if we get to that point he could actually vote for death, and having that kind of a question in my mind as I'm trying this case would be distracting and worrisome to me during the process of the trial.

The trial judge accepted the prosecutor's reasons noting that although Robert M. "is certainly pro the death penalty," his answers varied and "there may well be a legitimate concern as to whether or not he could impose it." The court further noted that "an appropriate use of a peremptory would be for a person that any party feels either could not vote for death or could not vote for life." In affirming Ayala's conviction the California Supreme Court observed "that Robert M. was less than desirable from the prosecution's point of view." *Ayala*, 6 P.3d at 206.

Again, the majority does not really question the prosecutor's reasons, but speculates that had Ayala's counsel been present he might have argued that Robert M.'s reluctance to impose the death penalty was not different from other jurors' reluctance. Majority at p. 10126-27. In addition, the majority does not deny that Robert M. had stated that he had followed the Sagon Penn case, but argues that he only mentioned this briefly.[9] Majority at p. 10127-28. Nonetheless, Robert M.'s interest in a recent notorious criminal case that involved misconduct by the prosecutor and resulted in a not guilty verdict is a legitimate non-discriminatory reason for recusal by the prosecutor.

4.    *The Other Jurors*

The majority does not mention the other four minority

---

[9]The extent of the majority's speculation is illustrated by its argument that because another juror who was seated mentioned that he was aware of the capital case *People v. Harris*, 623 P.2d 240 (Cal. 1981), the prosecutor's concern with Robert M.'s interest in the Sagon Penn case may have been pretextual. Majority at p. 10128. This argument assumes that somehow the *Harris* case was similar to the Sagon Penn case. This seems unlikely as the crime in *Harris* took place in 1978, some eleven years before the jury selection process in this case. Moreover, unlike the alleged verdict in the Sagon Penn case, Harris was found guilty and the California Supreme Court's opinion, which issued in 1981, did not find any serious misconduct by the district attorney.

jurors who were excused. Galileo S. was recused because he (a) displayed a non-conformist attitude to the justice system, (b) had more run-ins with the law than he admitted, and (c) had an attitude that might create alienation and hostility on the part of other jurors. Luis M. was challenged because he (a) expressed ambivalence on the death penalty, (b) had investigated the case on his own, and (c) left the military with a low rank suggesting some sort of misconduct or inability to perform. The prosecutor noted that George S. (a) had been a holdout juror on a prior jury, (b) was equivocal on the death penalty, (c) had been rejected as a police officer candidate, and (d) placed undue emphasis on the Bible. Barbara S. was challenged because (a) her responses to oral questions were slow, (b) she had an empty look in her eyes and seemed out of tune with what was going on, and (c) her written and oral answers were incomplete and non-responsive.

A review of the prosecutor's reasons for excusing these jurors shows that, as with the three jurors mentioned by the majority, the prosecution team offered individualized reasons for each recusal. There is no blatant racism, no reference to stereotypes — veiled or otherwise, and no discernable pattern of discrimination.

Nonetheless, the four recusals are susceptible to the type of speculative challenges that the majority hurls at the recusals of Olanders D., Gerardo O., and Robert M. Other jurors expressed ambivalence and equivalence about the death penalty. Other jurors offered slow or incomplete responses. Other jurors probably had been denied employment or performed poorly in a job. These might be appropriate avenues to explore at the time that a recusal is made. But we are reviewing a 1989 state trial pursuant to AEDPA, and the Supreme Court, in reversing the Ninth Circuit, recently reiterated that (a) *Batson* issues turn largely on evaluations of credibility, (b) the trial court's determination is entitled to great deference, (c) the determination must be sustained unless it is clearly erroneous, and (d) AEDPA demands that state-court decisions

be given the benefit of the doubt. *Felkner v. Jackson*, ___ U.S. ___, 131 S. Ct. 1305, 1307 (2011).

Perhaps the California Supreme Court was not compelled to conclude that "the challenged jurors were excluded for proper, race-neutral reasons." *Ayala*, 6 P.3d at 204. But its conclusion was certainly objectively reasonable.[10] Ayala has not shown that the California Supreme Court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87. Indeed, it appears that, as in *Harrington*, the majority's opinion "illustrates a lack of deference to the state court's determination and an improper intervention in state criminal processes, contrary to the purpose and mandate of AEDPA and to the now well-settled meaning and function of habeas corpus in the federal system." *Id.* at 787. I agree with the district court's denial of relief and accordingly, dissent from the majority's opinion.

---

[10]I do not agree with the characterizations of my dissent set forth in Section VI of the opinion. I have set forth my reasons in this dissent and trust that the reader will be able to discern the respective merits of the majority and dissent without further assistance. To the extent Section VI curtails the potential scope of the opinion, that, in my opinion, improves the disposition.